STATE OF NORTH CAROLINA v. ROBERT BACON, JR.

No. 364A87

(Filed 5 April 1990)

**1. Criminal Law § 686 (NCI4th) — capital case — failure to record charge conferences — harmless error**

Even though the trial court's failure in a capital trial to have two in chambers charge conferences recorded may have constituted error, defendant was not prejudiced where the court summarized the unrecorded conferences for the record, counsel for each side was given the opportunity to state for the record any further objections, disagreements or dissatisfaction with the court's summations, and no concerns were raised by counsel. N.C.G.S. §§ 15A-1241, 15A-1231(b).

**Am Jur 2d, Criminal Law § 880; Trial §§ 573-575.**

**2. Criminal Law § 75.7 (NCI3d) — inculpatory statements to police — absence of custodial interrogation — Miranda warnings not required**

Although defendant had not been given the Miranda warnings before he made inculpatory statements to the police at his residence on the night of a murder, the statements were admissible at defendant's murder trial because defendant (1) was not in custody or under arrest at the time he made the statements in that a reasonable person in defendant's position would not have considered himself in custody, and (2) defendant's statements were not the product of questions or interrogation by the police, where the record shows: officers found the victim dead from stab wounds and his estranged wife injured in a car in a parking lot; officers were informed that a violent robbery of the victim and his estranged wife had occurred and that the wife's children were at home with a baby sitter; when officers went to the home to check on the children, defendant opened the door wearing a bathrobe and a shower cap; an officer told defendant that he was there "investigating a very serious matter" and inquired as to his identification; defendant invited the officers into his bedroom when asked if they could speak privately; an officer asked defendant "if he would object to our looking around the bedroom for any evidence of a crime that had been committed"; an

STATE v. BACON

[326 N.C. 404 (1990)]

officer told defendant that he was not under arrest at that time and defendant readily gave permission to a search; the search revealed a pair of dark pants with a dark stain on them; defendant was then asked if he owned a pair of tennis shoes; when defendant denied owning shoes such as the ones described by eyewitnesses, an officer remarked that "if we locate a pair of white shoes in this bedroom, and if they have blood on them, then it's all over"; an officer also told defendant that the victim was dead and that "he can't tell us what happened, but if you are involved, it may have been self-defense, so you are the only one that can shed any light on what has happened"; defendant then admitted that he had been involved in a confrontation with the victim and that he had killed him; defendant directed officers to the remainder of his bloodstained clothes and to the area where he had discarded the knife with which he had stabbed the victim; and defendant was then arrested and transported to the police station where he was advised of his constitutional rights.

**Am Jur 2d, Evidence §§ 545, 552, 555-557.**

3. **Jury § 7.14 (NCI3d) — capital case — qualms about death penalty — peremptory challenges**

It was neither constitutionally nor otherwise improper for the prosecution to use its peremptory challenges to excuse potential jurors who expressed qualms or some hesitancy about the death penalty but who were not excludable under *Witherspoon v. Illinois*, 392 U.S. 520.

**Am Jur 2d, Jury § 289.**

4. **Criminal Law § 252 (NCI4th) — alleged illness of defendant — refusal to recess trial**

The trial judge in a capital case did not abuse his discretion in proceeding with jury selection and failing to recess the trial when informed by defense counsel that defendant was so physically ill that it was interfering with his ability to participate in the proceedings where a physician examined defendant and reported to the court that there was no evidence that defendant was sick, and defendant failed to demonstrate even one occasion when he was unable to comprehend the proceedings or to communicate his opinions of the jurors to his counsel as a result of his alleged illness.

**Am Jur 2d, Continuance § 39.**

STATE v. BACON

[326 N.C. 404 (1990)]

**5. Criminal Law § 497 (NCI4th)— police report not in evidence— denial of jury's request to review**

The trial court properly determined that the focus of the jury's request to review evidence during its deliberations was a written police report, and the court properly denied the jury's request where the police report had not been placed into evidence but was used by a witness only to refresh his recollection.

**Am Jur 2d, Trial § 1028.**

**6. Criminal Law § 1363 (NCI4th)— capital case—mitigating circumstance—aiding apprehension of another capital felon— erroneous failure to submit**

The trial court in a first degree murder case committed prejudicial error in failing to submit the mitigating circumstance that "defendant aided in the apprehension of another capital felon," N.C.G.S. § 15A-2000(f)(8), where the evidence showed that the victim's estranged wife, who was defendant's accomplice, told police that the victim had been killed by mysterious assailants who had opened her car door and rendered her unconscious; at approximately the same time, defendant told police officers that he had been in the automobile with the victim's wife and the victim, that the victim made a racial remark to him and pulled a knife on him, and that he grabbed the knife from the victim and stabbed him; and although defendant's story did not turn out to be totally accurate with respect to motive and intent, it caused officers to focus on the victim's wife as a possible accomplice in the murder. This error was not cured by the court's instruction on the law as to the "apprehension" circumstance where the written issues submitted to the jury included only an issue as to whether defendant aided in the "prosecution" of another felon.

**Am Jur 2d, Criminal Law §§ 598, 599.**

APPEAL of right by defendant pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a death sentence for murder in the first degree entered by *Stevens, J.*, at the 18 May 1987 Criminal Session of Superior Court, ONSLOW County. Heard in the Supreme Court 12 February 1990.

## STATE v. BACON

[326 N.C. 404 (1990)]

*Lacy H. Thornburg, Attorney General, by David Roy Blackwell, Special Deputy Attorney General, for the state.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by David W. Dorey, Assistant Appellate Defender, for defendant-appellant.*

MARTIN, Justice.

Defendant was convicted of murder in the first degree and common law conspiracy to commit murder. The jury recommended the death sentence and the trial court sentenced accordingly. The trial court further imposed a sentence of three years imprisonment for the conspiracy. Having performed a careful and thorough review of the record, we conclude that as to the guilt phase defendant received a fair trial free of prejudicial error. However, with respect to his sentencing hearing, defendant contends that the trial court failed to submit a statutory mitigating factor. We agree and conclude that this constituted prejudicial error in the penalty phase of defendant's trial. Thus, we remand for a new capital sentencing hearing. We find no error on the conspiracy charge.

The state's evidence tended to show the following:

On 1 February 1987, the body of Glennie Leroy Clark, a United States Marine Corps staff sergeant, was discovered at approximately 11:00 p.m. in a gray Pontiac Sunbird parked in the lot of Cinema Six Theater in Jacksonville, North Carolina. A taxi driver had noticed the vehicle with the passenger door open and notified the police. Officer J. J. Phillips, the first officer to arrive at the scene, noticed a white male lying on his left side between the bucket seats and a white female sitting in the driver's seat with her head resting on the steering wheel. As another police officer reached into the automobile to check the occupants, the female regained consciousness and started screaming, "How's Glennie? How's Glennie?" It was later determined that the occupants were Glennie Clark and his estranged wife, Bonnie Sue Clark. Clark had apparently died of numerous stab wounds. An autopsy was performed which revealed that the victim had been stabbed sixteen times. The three most serious wounds consisted of a one-inch deep wound in the chest and two in the abdominal cavity, each approximately one and one-half inches in depth. The chest wound was fatal.

David Black, also a member of the United States Marine Corps, had taken his fiancee to dinner and the couple was planning to

go to a movie. Arriving at the theater at 8:30 p.m., Mr. Black noticed a yellow Camaro or Firebird driven by a black male pull into the parking lot followed by a small gray car driven by a white female. He later identified the two drivers as the defendant, Robert Bacon, and Bonnie Sue Clark. Defendant got into the gray car with Bonnie Sue and they drove away. After the movie, Mr. Black noticed several police cars surrounding the gray car which had been returned to the parking lot. While speaking with the investigating police officers, he further noticed that the windshield of the gray car had a fresh crack in it which had not been present earlier in the evening.

Deputy Chief of Police Delma G. Collins and several officers proceeded to 121 Shadowbrook Road where defendant currently lived with Bonnie Sue Clark. Upon arrival, they noticed a yellow Pontiac Firebird parked in the garage. Defendant answered the door. He was wearing a shower cap and a bathrobe and appeared to have just showered. Chief Collins identified himself and defendant invited the officers into his home. Defendant led the officers into his bedroom when asked if they could speak privately. Defendant also agreed to allow the officers to look around the room. Commander Buchanan found a pair of dark trousers with a dark stain on them. Chief Collins told defendant, "Robert, if we locate a pair of white tennis shoes in this bedroom and if they have blood on them, you know it's all over. . . . If you're involved, it may have been self-defense, so you're the only one that can shed any light on what happened." Defendant replied that the victim had become belligerent while he and Bonnie Sue were discussing a problem and that the victim called him a "nigger" and pulled a knife on him. Defendant stated that he acted in self-defense and grabbed the knife and stabbed the victim sixteen times. Defendant then directed the officers to the remainder of the clothing he had been wearing when the incident occurred. At this point, defendant was placed under arrest.

Defendant was advised of his Miranda rights but later signed a waiver and gave a statement to the police including the following information: Earlier in the evening of 1 February 1987 he intended to demonstrate a Kirby vacuum cleaner to a family but they were not at home; he drove to the Cinema Six Theater parking lot to meet Bonnie Sue and got into her car; they drove to pick up the victim to discuss some problems; defendant got into the back seat and allowed the victim to get into the front seat with Bonnie

STATE v. BACON

[326 N.C. 404 (1990)]

Sue; as the victim got into the car he looked at defendant and asked, "What's this shit?"; the three people entered into a heated discussion concerning Bonnie Sue's relationship with defendant; the victim pulled a knife with a camouflaged handle and began waving it around in his wife's direction; defendant told the victim to put it away or he [defendant] would kill him; defendant took the knife away from the victim and began stabbing him; as they drove through the Piney Green Road section of town, defendant threw the knife away; Bonnie Sue kept driving and asked if her husband was dead; defendant checked the victim's pulse and found none; upon returning to the theater parking lot, defendant pushed Bonnie Sue's head into the windshield and drove himself home in the yellow Firebird.

Later defendant revised his statement to include the following: The knife which was used to kill Glennie Clark actually came from a box in the garage of 121 Shadowbrook Road; and, defendant and Bonnie Sue Clark had planned to kill the victim on 31 January 1987 but defendant had "chickened out." Defendant then directed the police to the area where he claimed to have thrown out the knife, and it was located in that general area.

Dale Evans, who worked and resided with defendant and Bonnie Sue Clark, testified that defendant had told him that he would receive $250,000 in February. On 31 January, he stated that defendant told him that Bonnie Sue was going out with her husband. Earlier that day, Mr. Evans recalled that defendant and Bonnie Sue stayed in the bedroom a long time and that Bonnie Sue called and asked someone if they still wanted to go out that night. Mr. Evans assumed that the person on the other end of the telephone said yes because Bonnie Sue then suggested they see a movie. That evening defendant left the house around 7:00 p.m. to make a sales presentation and Bonnie Sue Clark left at approximately 7:30 p.m. Defendant drove the yellow Firebird and Bonnie Sue was driving a gray Buick Skylark. Mr. Evans testified that it was his belief that a Saturday night sales presentation was highly unusual. After defendant and Bonnie Sue were arrested for the murder of Glennie Clark, Mr. Evans went through some papers and found an insurance policy in the amount of $50,000 on the life of Glennie Clark with Bonnie Sue Clark as the named beneficiary. Another policy in the amount of $80,000 was later discovered which also listed Bonnie Sue Clark as the beneficiary.

The state produced extensive corroborating evidence including a forensic serologist who found the blood on defendant's clothing to be that of the victim; a fingerprint and footprint expert who determined that it was defendant's bloody shoe print on the seat of the car; a fiber analyst who determined that the fibers removed from the knife came from the victim's shirt; and, a pathologist who testified that the cause of death was a stab wound which penetrated the heart and that the time of death was approximately 9:30 p.m.

Defendant did not testify and presented no additional evidence. The jury returned a verdict of guilty of murder in the first degree and felonious conspiracy to commit murder.

At the sentencing hearing, the state introduced no further evidence. The defendant testified in his own behalf that: He met Bonnie Sue Clark in 1986 when they were both working for the Kirby Company; they shared a house and finally a bedroom but he denied any romantic involvement; he knew of her difficulties with her husband (particularly his drinking and abuse of Bonnie Sue and the children); Bonnie Sue at some point had told him that she wished her husband was dead and did he know of anyone who would kill him; he knew the victim possessed insurance but denied killing him for the proceeds of the policies; he finally agreed to kill the victim; the two planned the murder for the night of 31 January 1987· but he found he could not do it; he told Bonnie Sue that the presence of police and other persons prevented it; he and Bonnie Sue did not discuss the murder plan on Sunday (the day of the actual murder); they met with the victim on that night merely to discuss the problem of his numerous telephone calls to Bonnie Sue; the attack occurred as previously described except that the victim never had the knife; they returned to the parking lot; defendant faked a robbery and he returned home. Defendant further testified that he killed the victim out of anger — not for money. He denied being in love with Bonnie Sue and stated that he disliked her two children. Nineteen additional witnesses testified in defendant's behalf including his parents and sister. They stated that he was well-behaved, hard working and a non-violent person who normally went out of his way to avoid conflict.

The jury found beyond a reasonable doubt that the aggravating circumstances outweighed the mitigating circumstances and recom-

STATE v. BACON

[326 N.C. 404 (1990)]

mended the death sentence. The trial court duly sentenced defendant to death on 4 June 1987.

## GUILT-INNOCENCE PHASE

### I.

[1] Defendant first assigns as error the trial court's partial denial of defendant's motion for complete recordation in that it precluded recordation of bench conferences and in chamber proceedings. We hold that, although the court's decision may have constituted error under the applicable statutes, defendant was not prejudiced as a result thereof.

N.C.G.S. § 15A-1241 requires that, in capital cases, a true, complete and accurate record be made of all proceedings except opening statements, final jury arguments and arguments of counsel on questions of law. Upon proper motion by counsel, these proceedings must also be duly recorded.

Defendant in his brief does not raise the issue of any unrecorded bench conferences. He does argue that two charge conferences were unrecorded. N.C.G.S. § 15A-1231(b) sets forth the following in pertinent part:

> (b) Before the arguments to the jury, the judge must hold a recorded conference on instructions out of the presence of the jury. . . . The failure of the judge to comply fully with the provisions of this subsection does not constitute grounds for appeal unless his failure, not corrected prior to the end of the trial, materially prejudiced the case of the defendant.

In the case *sub judice*, the trial court conducted an unrecorded conference on jury instructions in chambers. For the record, the court noted that

> [o]pportunity was given to counsel representing both sides to request additional instructions or object to any of the instructions proposed by the Court; that thereafter all counsel on both sides agreed in substance to the charge to be given and to the possible jury verdicts to be submitted. Is that correct, Mr. Solicitor?

The District Attorney and defense counsel each replied affirmatively. Later, during the sentencing phase, the trial court conducted

a second unrecorded conference in chambers. The court summarized the conference as follows:

> That an opportunity was given to attorneys representing the State and the defendant to request additional instructions or object to any of the instructions proposed by the Judge. That thereafter all counsel agreed in substance to the charge to be given in this second or sentencing hearing and the issues and recommendations to be submitted, except that the defendant objected to the submission of the two alleged factors in aggravation, being No. 1, that the murder was committed for pecuniary gain; and second, the murder was especially heinous, atrocious and cruel, and the Court gave specific exception upon that objection, which the Court overruled and will submit as being, in its opinion, proper. Gentlemen, is there anything else?

At this point, defense counsel again consented to the accuracy of the court's summation of the proceeding. In both instances, counsel for both sides was given the opportunity to state, for the record, any *further* objections, disagreements or dissatisfaction he had with the court's summations. In both instances, no further concerns were raised. Defendant has failed to demonstrate how he was materially prejudiced by the failure of the trial court to record the bench conferences or the in chambers conferences. N.C.G.S. § 15A-1231(b) (1988).

## II.

[2] Defendant next contends that the trial court erred in denying his motion to suppress statements made to the police at his residence on the night of the murder. He argues that the statements were the product of an unconstitutional custodial interrogation in violation of his fifth amendment right to be free from compelled self-incrimination and to have legal counsel present. *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694 (1966). We disagree and hold that the evidence supports the court's findings of fact, conclusions of law and the order denying defendant's motion to suppress. The statements made by defendant to the officers as well as the blood-soaked clothing and towels taken from defendant's residence were properly admitted into evidence.

The question here turns on whether a reasonable person in defendant's position would believe that "he had been taken into custody or otherwise deprived of his freedom of action in any

significant way." *State v. Davis*, 305 N.C. 400, 410, 290 S.E.2d 574, 580-81 (1982). Our review of the record indicates that the following events took place: Jacksonville police officers responded to a call at approximately 11:00 p.m. at the Cinema Six parking lot; upon arrival, they found Bonnie Sue Clark injured and her estranged husband dead apparently from numerous stab wounds; Chief Collins was informed that the Clarks were the victims of a violent robbery; Chief Collins was further informed that Bonnie Sue Clark's children were at home with a baby sitter; Chief Collins dispatched Officer Phillips to 121 Shadowbrook Road to "stand by" until he arrived; Chief Collins and other officers arrived later and knocked on the front door of the house to check on the children; Robert Bacon, Jr. (defendant) opened the door wearing a bathrobe and a shower cap; Chief Collins told him that he was there "investigating a very serious matter" and "inquired as to his identification"; defendant invited the officers into the foyer and then into his bedroom when asked if they could speak privately; after they entered and the door was closed, Chief Collins asked defendant "if he would object to our looking around in the bedroom for any evidence of a crime that had been committed"; Chief Collins told defendant that he was not under arrest at that time and defendant readily gave permission to a search; the search revealed a pair of dark pants with a dark stain on them; defendant was then asked if he owned a pair of tennis shoes; when he denied owning shoes such as the ones described by eyewitnesses, Chief Collins remarked that "if we locate a pair of white shoes in this bedroom, and if they have blood on them, then it's all over"; Chief Collins also told defendant that "Glennie Clark is dead and he can't tell us what happened, but if you are involved, it may have been self-defense, so you are the only one that can shed any light on what has happened"; defendant then admitted that he had been involved in a confrontation with Glennie Clark and that he had killed him; defendant directed them to the remainder of his bloodstained clothes and to the area where he had discarded the knife with which he had stabbed Clark; and then defendant was arrested and transported to the police station where he was advised of his constitutional rights. Following advice and a waiver of rights, defendant provided the police officers with a further account of the conspiracy and the murder.

Our further analysis of the record indicates that: Defendant voluntarily admitted Chief Collins and the other officers into his

home; police officers had no search warrant because at the time they entered the home they did not believe they had sufficient information to obtain a warrant; at no time did the police officers threaten defendant; defendant never declined to answer questions; defendant never asked the officers to leave; the conversation was conducted in a cordial manner throughout the incident; and, the early morning hour was inconsequential since defendant received the officers after having just taken a shower rather than having been rudely awakened in the middle of a sound night's sleep. Although defendant had not been given his Miranda warnings before he made the inculpatory statement, this did not constitute error. First, defendant was not in custody or under arrest at the time he made the statement. Second, defendant's statement was not the product of questions or interrogation by the officers. The trial court properly concluded that a reasonable person in defendant's position would not have considered himself in custody at the moment he made inculpatory statements to the police regarding the murder of Glennie Clark. *State v. Jackson*, 308 N.C. 549, 304 S.E.2d 134 (1983), *judgment vacated on other grounds, Jackson v. North Carolina*, 479 U.S. 1077, 94 L. Ed. 2d 133 (1987). This assignment of error is without merit.

### III.

[3] In his third assignment of error, defendant argues that the prosecutor unconstitutionally compiled a jury uncommonly willing to condemn a man to die by using his peremptory challenges to remove potential jurors who were not sufficiently enthusiastic about the imposition of the death penalty. Defendant concedes that this Court has rejected his argument several times — most recently in *State v. Allen*, 323 N.C. 208, 372 S.E.2d 855 (1988), *death sentence vacated on other grounds, Allen v. North Carolina*, --- U.S. ---, 108 L. Ed. 2d 601 (1990). We decline defendant's request to reconsider the constitutionality of the holding in *Allen* and its precedent. It was neither constitutionally nor otherwise improper for the prosecution to use its challenges to excuse potential jurors who were not excludable for cause pursuant to *Witherspoon v. Illinois*, 391 U.S. 510, 20 L. Ed. 2d 776, *reh'g denied*, 393 U.S. 898, 21 L. Ed. 2d 186 (1968), but who expressed qualms or some hesitancy about their ability to impose the death penalty. *See Wainwright v. Witt*, 469 U.S. 412, 83 L. Ed. 2d 841 (1985). Our prior holdings stand.

STATE v. BACON

[326 N.C. 404 (1990)]

IV.

[4] Defendant next contends that the trial court abused its discretion in proceeding with jury selection when informed by defense counsel that defendant was so physically ill it was interfering with his ability to participate in the proceedings. Although defendant did not move for a continuance or a recess, he contends that the court's failure to recess the trial violated his constitutional rights of due process, effective assistance of counsel and confrontation. We disagree.

During jury selection, defense counsel informed Judge Stevens that defendant was not feeling well. A physician was summoned who examined defendant and reported to the court the following:

Your Honor, I examined the patient and he gave a history that he throwed [sic] up once this morning but on further questioning with inmates there, they deny seeing him throw up, and also an examination by [sic] his blood pressure was fine. His pulse was a little high which is understandable. There is no evidence that he is sick and I think he's basically fit to undergo the trial.

The trial court determined that, based on this report, jury selection would continue. Defendant objected and the court allowed him to "say how he feels for the record":

THE DEFENDANT: I just have a headache and upset stomach and I don't—I don't feel good.

THE COURT: Of course the pressures—I'm not a doctor but that in itself, sir, has not in any way affected your abilities to understand these charges against you and what you are being tried for and what's going on, has it?

THE DEFENDANT: No, sir.

THE COURT: And you are not impaired from communicating and talking about your case, are you?

THE DEFENDANT: Yes, sir.

THE COURT: In what respect?

THE DEFENDANT: Because they want me to pay attention to what the Jurors say and I can't because my head is pounding.

THE COURT: Are you sick to your stomach now?

THE DEFENDANT: Yes, sir.

THE COURT: And you have got a headache?

THE DEFENDANT: Yes, sir.

THE COURT: And because of that you're saying you can't pay attention?

THE DEFENDANT: Yes, sir.

Judge Stevens then noted that defendant appeared well and stated, "I am going to continue, gentlemen. If you feel like that he can't communicate at any time and you can give me some assurance of that, I will take a look at it. Until that time we will continue." The record contains no subsequent statements to this effect from defense counsel.

Even if defendant had moved for a continuance or recess, such decision "rests in the sound discretion of the presiding judge and his decision will not be disturbed on appeal, except for abuse of discretion or a showing the defendant has been deprived of a fair trial." *State v. Ipock*, 242 N.C. 119, 120-21, 86 S.E.2d 798, 800 (1955). Defendant fails to demonstrate even one occasion where he was unable to comprehend the proceedings or to communicate his opinions of the jurors to his counsel as a result of his alleged illness. Defendant's reliance upon N.C.G.S. § 15A-1001 is misplaced as that statute is only concerned with defendant's mental capacity to proceed. No abuse of discretion is shown.

## V.

[5] Defendant's last assignment of error in the guilt-innocence phase of his trial is that the trial court improperly denied the jury's request to review certain portions of the evidence. Defendant interprets the jury's request to indicate it wanted to review Chief Collins' testimony concerning Bacon's statement.

During deliberations, the foreman indicated to the bailiff that the jury felt the need to further review evidence. The jury was brought back into the courtroom and the following exchange took place:

THE FOREMAN: Yes, your Honor. The Jury has a problem in our minds. We were wondering if there is any of the evidence that we can view at this time.

THE COURT: Specifically, Mr. Foreman, did you have in mind —

THE FOREMAN: Sir, the question that we have is concerning some of the —

THE COURT: Just tell me the exhibit you want, if you know what it is.

THE FOREMAN: Not by number, but the *police report*. (emphasis added).

THE COURT: Sir?

THE FOREMAN: The report that the defendant made in the presence of the policeman.

. . . .

THE COURT: Mr. Foreman, ladies and gentlemen, the Court has conferred with counsel for the State and for the defendant and as the Court recollects that the witness referred to the document that you asked for the purpose only of refreshing his recollection. The Court remembers that in his opinion, which is shared by lawyers on both sides, that the document was never admitted into evidence. Therefore, it is not an exhibit. Therefore, it is not subject to scrutiny by the Jury. Was there any other document or anything else you wanted to see?

THE FOREMAN: No, sir.

THE COURT: Is that it?

THE FOREMAN: Yes, sir.

Our careful review of the record reveals that the court properly determined that the focus of the jury's request was the written police report. This report was not placed into evidence; therefore, it is not reviewable by the jury during its deliberations. This assignment of error is without merit.

### PENALTY PHASE

[6] Defendant contends that it was prejudicial error for the trial court to fail to submit the mitigating circumstance that "defendant aided in the apprehension of another capital felon." N.C.G.S. § 15A-2000(f)(8) (1988). We agree and hereby remand the case to the trial court for a new sentencing hearing.

N.C.G.S. § 15A-2000(f) states, in pertinent part:

(f) Mitigating Circumstances.—Mitigating circumstances which may be considered shall include, but not be limited to, the following: . . . (8) The defendant aided in the apprehension of another capital felon or testified truthfully on behalf of the prosecution in another prosecution of a felony.

The form entitled "Issues and Recommendation as to Punishment" which was submitted to the jury listed as a mitigating circumstance that the defendant aided in the *prosecution* of another felon but not that the defendant aided in the *apprehension* of another capital felon.

It is well settled in our jurisdiction that "[w]hen evidence is presented in a capital case which may support a statutory mitigating circumstance, the trial court is mandated by the language in N.C.G.S. § 15A-2000(b) to submit that circumstance to the jury for its consideration." *State v. Lloyd*, 321 N.C. 301, 311-12, 364 S.E.2d 316, 323, *vacated and remanded on other grounds*, --- U.S. ---, 102 L. Ed. 2d 18, *reinstated*, 323 N.C. 622, 374 S.E.2d 277 (1988), *death sentence vacated on other grounds, Lloyd v. North Carolina*, --- U.S. ---, 108 L. Ed. 2d 601 (1990) "[C]ommon sense, fundamental fairness and judicial economy dictate that any reasonable doubt concerning the submission of a statutory or requested mitigating factor be resolved in the defendant's favor to ensure the accomplishment of complete justice at the first sentencing hearing." *State v. Pinch*, 306 N.C. 1, 27, 292 S.E.2d 203, 223, *cert. denied*, 459 U.S. 1056, 74 L. Ed. 2d 622 (1982), *reh'g denied*, 459 U.S. 1189, 74 L. Ed. 2d 1031 (1983). Our review is thus limited to whether the record reveals any evidence to support a reasonable finding by the jury that this defendant "aided in the apprehension" of Bonnie Sue Clark.

The record reveals that on the night of the murder Bonnie Sue Clark told the police that mysterious assailants had opened her car door and slammed her head against the steering wheel thus rendering her unconscious. She was unable to provide further information as to her assailants. After being examined at the hospital, she reiterated her exculpatory statements and reduced them to writing at the police station. *See State v. Clark*, 324 N.C. 146, 377 S.E.2d 54 (1989). At approximately the same time, defendant told police officers that: He had been in the automobile with Bonnie Sue Clark and the victim, Glennie Leroy Clark; the victim called

him a "nigger" and pulled a knife on him; he grabbed the knife from the victim and stabbed him; and, all of this took place while Bonnie Sue Clark was in the vehicle. It was at this point that the investigators first began to focus on Bonnie Sue Clark as a possible accomplice in the murder. Obviously if defendant's version of the events was proven true, then Bonnie Sue Clark was lying. Defendant's story did not turn out to be totally accurate with respect to motive, intent, etc. However the fact that defendant, not mysterious assailants, did the killing was sufficient to arouse the suspicions of the investigating police officers as to Bonnie Sue's role in this killing. This is sufficient to submit the mitigating circumstance of aiding "in the apprehension of another capital felon" to the jury. It was error not to do so.

In order to show reversible error in the trial court's omission of a statutory mitigating circumstance in a capital case, defendant must affirmatively establish three things:

> (1) that the particular factor was one which the jury could have reasonably deemed to have mitigating value (this is presumed to be so when the factor is listed in G.S. 15A-2000(f)); (2) that there was sufficient evidence of the existence of the factor; and (3) that, considering the case as a whole, the exclusion of the factor from the jury's consideration resulted in ascertainable prejudice to the defendant.

*State v. Pinch*, 306 N.C. at 27, 292 S.E.2d at 223-24. In the case *sub judice*, the presumption that circumstances listed in N.C.G.S. § 15A-2000(f) have mitigating value is applicable. We have further found that there was sufficient evidence to support the assertion that defendant aided in the apprehension of his co-conspirator. Now we find that the omission of this factor potentially worked to the prejudice of defendant and, as a result, he is entitled to a new sentencing hearing.

We are aware that the trial court charged the jury on the law as to the "apprehension" circumstance. The state argues that this instruction cured the error of failing to submit the "apprehension" mitigating circumstance on the written issues to be answered by the jury. We reject this argument. The instruction on "apprehension" was completely irrelevant to the issue on "prosecution" which was before the jury; this is manifested by its negative answer to the issue. The jury's "no" answer to the "prosecution" circumstance was entirely proper, there being no evidence to support the cir-

cumstance and no instructions by the trial court on the issue. This left the instructions as to the "apprehension" circumstance floating in a void, without any reference to written issues before the jury. *See State v. Harris*, 289 N.C. 275, 221 S.E.2d 343 (1976). Failing to submit the proper mitigating circumstance created too great a "risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty. When the choice is between life and death, that risk is unacceptable and incompatible with the commands of the Eighth and Fourteenth Amendments." *Lockett v. Ohio*, 438 U.S. 586, 605, 57 L. Ed. 2d 973, 990 (1978).

It is impossible for the reviewing court to conclusively determine the extent of the prejudice suffered by defendant; however, defendant has shown that there is a reasonable possibility that had this mitigating circumstance been submitted to the jury, a different result would have been reached at the sentencing hearing. N.C.G.S. § 15A-1443(a) (1988).

We are cognizant of the recent holding in *McKoy v. North Carolina*, --- U.S. ---, 108 L. Ed. 2d 369 (1990), and its probable effect on the sentencing hearing in this case. However, as defendant is being awarded a new sentencing hearing for the reasons stated, we do not find it appropriate to discuss *McKoy* in this opinion.

We find no prejudicial error in the guilt phase of defendant's trial. For error in the sentencing phase of defendant's trial, the death sentence is vacated and the cause is remanded to Superior Court, Onslow County, for a new sentencing hearing.

Guilt Phase—no error.

Sentencing Phase—death sentence vacated; remanded for a new sentencing hearing.