**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

ROBERT BACON, JR.,
Petitioner-Appellee,

v.

No. 99-21

R. C. LEE, Warden, Central Prison,
Raleigh, North Carolina,
Respondent-Appellant.

ROBERT BACON, JR.,
Petitioner-Appellant,

v.

No. 99-23

R. C. LEE, Warden, Central Prison,
Raleigh, North Carolina,
Respondent-Appellee.

Appeals from the United States District Court
for the Eastern District of North Carolina, at Raleigh.
W. Earl Britt, Senior District Judge.
(CA-97-395-5-HC-BR)

Argued: May 3, 2000

Decided: August 30, 2000

Before NIEMEYER, TRAXLER, and KING, Circuit Judges.

_____

Affirmed in part and reversed in part by published opinion. Judge
Niemeyer wrote the opinion, in which Judge Traxler joined. Judge
King wrote a separate opinion concurring in the judgment in part and
dissenting in part.

## COUNSEL

**ARGUED:** Edwin William Welch, Special Deputy Attorney General, Teresa Lynn Harris, Special Deputy Attorney General, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellant. Gretchen Marie Engel, CENTER FOR DEATH PENALTY LITIGATION, INC., Durham, North Carolina, for Appellee. **ON BRIEF:** Stephen R. Greenwald, AUDREY COHEN COLLEGE, New York, New York, for Appellee.

_____

## OPINION

NIEMEYER, Circuit Judge:

A North Carolina jury convicted Robert Bacon of the murder of Glennie Clark and sentenced him to death. On appeal, the North Carolina Supreme Court vacated the death sentence, ruling that there was sufficient evidence to support a statutory mitigating circumstance that the trial court had failed to submit to the jury. Following a second sentencing hearing, a second jury again imposed the death penalty.

After exhausting his direct appeals and state post-conviction remedies, Bacon petitioned the district court for a federal writ of habeas corpus, raising 28 claims of error that he contended justified issuance of the writ under 28 U.S.C. § 2254. The district court entered summary judgment in favor of the State on all of the claims except one. With respect to the one claim -- that Bacon was denied effective assistance of counsel by the failure of his attorneys at the resentencing hearing to introduce evidence that he aided in the apprehension of his accomplice -- the district court ordered an evidentiary hearing. After conducting this hearing, the court determined that Bacon had received ineffective assistance of counsel, rendering the result of his resentencing hearing "fundamentally unfair, or at the very least, unreliable." Accordingly, the court granted the writ on this claim.

North Carolina filed this appeal to challenge the district court's order granting the writ, and Bacon filed a cross-appeal challenging the court's rulings rejecting six of his other claims for relief. For the

2

reasons that follow, we reverse the district court's grant of the writ based on the ineffective assistance of counsel and affirm its rulings rejecting Bacon's other claims for relief.

I

Robert Bacon was convicted and sentenced to death for the February 1, 1987 murder of Glennie Clark, the estranged husband of Bacon's lover, Bonnie Sue Clark.

Bonnie Sue and Glennie Clark were married in 1982 and had two children. Because Glennie became an alcoholic and physically abusive, see State v. Clark, 377 S.E.2d 54, 57-58 (N.C. 1989); State v. Bacon, 390 S.E.2d 327, 330 (N.C. 1990) (hereinafter "Bacon I"), Bonnie Sue moved out of the house in 1986 and took up residence with Bacon, who was a coworker, and another friend, see Clark, 377 S.E.2d at 58. Despite their separation, Glennie continued to harass Bonnie Sue by telephone, and "`the worse things got' between her and her husband, the closer she drew emotionally and romantically to Bacon." Id.

Bonnie Sue confided in Bacon about her difficulties with Glennie and "at some point . . . told [Bacon] that she wished her husband was dead and did he know of anyone who would kill him." Bacon I, 390 S.E.2d at 330. Bacon "finally agreed to kill[Glennie]," and Bonnie Sue and Bacon planned the murder for January 31, 1987. Id. Bonnie Sue was the beneficiary of Glennie's life insurance policies totaling $130,000, and Bacon reportedly told acquaintances that he expected to receive a large inheritance. See State v. Bacon, 446 S.E.2d 542, 565 (N.C. 1994) (hereinafter "Bacon II").

Under the plan, Bonnie Sue was to accompany Glennie to a movie theater, where Bacon would kill him, but Bacon "`chickened out' when it came time to execute the plan." Id. The following night, February 1, 1987, again pursuant to plan, see Clark , 377 S.E.2d at 58, Bonnie Sue and Bacon drove to Glennie's house to pick him up. Glennie reacted angrily when he saw Bacon in the back seat of Bonnie Sue's car, and a heated discussion ensued about Bonnie Sue's relationship with Bacon. See Bacon I, 390 S.E.2d at 329-30. At some point, Glennie called Bacon a "nigger," see id., prompting Bacon to

3

grab a knife that he had earlier placed on the floor of the car and fatally stab Glennie 16 times, see Bacon II, 446 S.E.2d at 565. Bonnie Sue then drove to a movie theater parking lot, where Bacon's car was parked. Bacon and Bonnie Sue decided to fake a robbery to cover up the murder, and pursuant to this ploy, Bacon knocked Bonnie Sue unconscious and went home in his car. See id.

Shortly after 11:00 p.m. on the same day, the police found Bonnie Sue slumped over the steering wheel of her car next to Glennie's dead body. See Bacon II, 446 S.E.2d at 565. Bonnie Sue told Jacksonville Police Officer J. J. Phillips that she and Glennie had been sitting in the car when the car doors were suddenly opened and she heard her husband exclaim, "Oh God, don't," before she was knocked unconscious. Bonnie Sue repeated this story to members of the rescue squad and to Sergeant Donna Waters who transported her to a hospital. She also told investigating officers that her two children were at home with a babysitter and gave them her home address.

Several hours later, at 1:15 a.m. on February 2, 1987, Sergeant Dennis Dinota picked Bonnie Sue up at the hospital and drove her to the Jacksonville police station where she again repeated the story she had told Officer Phillips and Sergeant Waters, and at approximately 2:00 a.m., she began writing out a statement describing how she had been attacked in the movie theater parking lot by two unknown individuals.

In the meantime, Jacksonville Deputy Chief Delma Collins went to the home shared by Bacon and Bonnie Sue to check on Bonnie Sue's children. Officer Collins arrived at 1:20 a.m. and was met at the door by Bacon, who invited Collins and other officers in the house and allowed them to "look around." After the officers discovered bloody clothing and shoes, Bacon confessed that he had killed Glennie Clark and directed the officers to other incriminating evidence. Bacon recounted that he "had been in the automobile with Bonnie Sue Clark and the victim, Glennie Leroy Clark; the victim called him a `nigger' and pulled a knife on him; he grabbed the knife from the victim and stabbed him; and, all of this took place while Bonnie Sue Clark was in the vehicle." Bacon I, 390 S.E.2d at 335. Bacon denied, however, that Bonnie Sue was involved in the crime.

4

Back at the police station, Bonnie Sue completed writing out her statement for Sergeant Dinota at 2:45 a.m. After Deputy Chief Collins informed Sergeant Dinota of the information he had learned about Bacon's involvement in the crime, the officers confronted Bonnie Sue with the information and, at 3:05 a.m., informed her of her Miranda rights. Later, Bacon admitted that parts of the story he had originally told to officers were false and admitted that he and Bonnie Sue had planned the crime.

Bacon was tried and convicted of first-degree murder and conspiracy to commit murder and sentenced to death.[1] Bacon I, 390 S.E.2d at 328. On direct appeal, the North Carolina Supreme Court upheld Bacon's conviction but found that evidence presented to the jury concerning Bacon's role in the police investigation of Bonnie Sue's involvement in the murder supported a jury instruction on the statutory mitigating circumstance of "aid[ing] in the apprehension of another capital felon." N.C. Gen. Stat. § 15A-2000(f)(8). Because no such "(f)(8)" instruction was given, the Supreme Court remanded the case for resentencing. See Bacon I, 390 S.E.2d at 328-29.

At Bacon's resentencing hearing, Bacon's counsel presented testimony by character witnesses who had testified in the first sentencing hearing. They also presented testimony by an expert witness, Dr. Billy Royal, a psychiatrist who testified about Bacon's family background and psychological profile. Unlike at the first sentencing hearing, the State did not introduce testimony by the officers who investigated the murder, relying instead primarily on Bacon's own testimony in the first sentencing hearing. The trial court submitted to the jury one aggravating circumstance -- that the murder was committed for pecuniary gain -- and 21 mitigating factors. The court did not, however, submit the (f)(8) mitigating factor because no evidence had been presented by the State or by Bacon that "showed the exact timing of [Bacon's] statements [to police] or their relation to the custodial status of [Bonnie Sue] Clark." Bacon II, 446 S.E.2d at 560.

The jury found the existence of the single aggravating circum-

_____

[1] Bonnie Sue was convicted of the same charges and sentenced to life imprisonment. See Clark, 377 S.E.2d at 57.

5

stance that the murder had been committed for pecuniary gain and also found the existence of nine mitigating circumstances: that Bacon

> had no significant history of prior criminal activity; acted under the domination of another person; had no history of violent behavior; had character, habits, mentality, propensities and activities indicating that he is unlikely to commit another violent crime; had committed the murder as the result of circumstances unlikely to recur; had established that his co-defendant, Bonnie Sue Clark, had received a life sentence; had shown remorse since his arrest; and had a family who loved him, continued to visit him while he [was] incarcerated, and would continue to do so if he were sentenced to life in prison.

Bacon II, 446 S.E.2d at 565. This jury also recommended the sentence of death, which the trial court imposed. Bacon pursued direct appeals, culminating in a second appeal before the North Carolina Supreme Court, which rejected his various claims of error and affirmed the death sentence. Id. at 570.

On September 25, 1995, Bacon initiated post-conviction proceedings by filing a motion for appropriate relief ("MAR") in the Superior Court of Onslow County ("the state MAR court"). On the same date, he filed a "Notice of Intention to Amend," in which he outlined various claims that were not addressed in the MAR because they required additional investigation and research. Pursuant to a motion by the State, the state MAR court summarily denied Bacon's MAR on November 20, 1995. Almost three months later, on February 15, 1996, Bacon filed a motion to reconsider the denial of his MAR and for leave to amend it. The state MAR court granted Bacon's motions for reconsideration of the court's November 20, 1995 order dismissing the MAR and for leave to amend his MAR, and on May 6, 1996, heard oral argument on the claims raised in Bacon's MAR and amended MAR.

On May 10, 1996, the state MAR court issued an order denying all of Bacon's claims, stating that it did not "have the authority to amend, modify, or vacate the [November 20, 1995] order denying the defen-

6

dant's Motion for Appropriate Relief." The court found that Bacon's amended MAR was

> in effect, a second Motion for Appropriate Relief since there was no pending Motion for Appropriate Relief to amend. The Court's order of November 20, 1995, was, and is, a final order. For this reason, [Bacon's] allegations as set out in [the claims made in the amended MAR] are procedurally barred.

Bacon sought and was denied certiorari review by the North Carolina Supreme Court and the United States Supreme Court. See State v. Bacon, 483 S.E.2d 179 (N.C. 1997); Bacon v. North Carolina, 522 U.S. 843 (1997).

Bacon filed this petition for federal habeas relief on November 26, 1997. Bacon's petition presented 28 claims that he contended justified this relief pursuant to 28 U.S.C. § 2254. The district court granted the State's motion for summary judgment as to all but one of the claims; with respect to the remaining claim -- that Bacon's attorneys at his resentencing hearing had rendered him ineffective assistance of counsel by failing to present evidence of the (f)(8) mitigating circumstance -- the district court conducted a hearing and ultimately determined that Bacon had received ineffective assistance of counsel, which rendered the result of his resentencing hearing "fundamentally unfair, or at the very least, unreliable." Based upon this finding, the district court granted the writ on this claim. These appeals followed.

II

North Carolina contends first that Bacon's (f)(8) claim -- that he was denied effective assistance of counsel because counsel failed to present evidence that Bacon aided in the apprehension of another capital felon -- was procedurally defaulted. Bacon, the State argues, did not raise this claim in his first MAR even though he was in a position to do so, and when he did first raise it in his amended MAR, it was procedurally defaulted.

The district court rejected the State's argument that Bacon's claim was procedurally defaulted. Although the court acknowledged that

7

North Carolina's statute imposing the procedural bar relied upon by the state MAR court was "generally" an independent and adequate State-law ground that would give rise to procedural default of the same claims on federal habeas review, it found that there were few reported incidences of the bar being applied in circumstances similar to the present case. Consequently, it concluded that it could not "apply the doctrine of procedural default" in the circumstances "as they are before this court."

A federal habeas court may not review a claim when a state court has declined to consider its merits on the basis of an independent and adequate state procedural rule. See Coleman v. Thompson, 501 U.S. 722, 731-32 (1991); Harris v. Reed, 489 U.S. 255, 262 (1989). A state procedural rule is independent if it does not "depend[ ] on a federal constitutional ruling," Ake v. Oklahoma, 470 U.S. 68, 75 (1985), and is adequate if it is regularly and consistently applied by the state court, see Johnson v. Mississippi, 486 U.S. 578, 587 (1988).

While the state MAR court did not cite authority for its treatment of Bacon's claim as procedurally barred, it appears that the court was relying on § 15A-1419(a) of the North Carolina Criminal Procedure Act, which provides, in pertinent part:

> The following are grounds for the denial of a motion for appropriate relief, including motions filed in capital cases:
>
> (1) Upon a previous motion made pursuant to [Article 89, Motion for Appropriate Relief and Other Post-Trial Relief], the defendant was in a position to adequately raise the ground or issue underlying the present motion but did not do so. This subdivision does not apply when the previous motion was made within 10 days after entry of judgment or the previous motion was made during the pendency of the direct appeal.

N.C. Gen. Stat. § 15A-1419(a)(1). We have consistently held that this provision constitutes an independent and adequate state ground that may give rise to procedural default of federal habeas claims. See Boyd

8

v. French, 147 F.3d 319, 332 (4th Cir. 1998); Ashe v. Styles, 39 F.3d 80, 87-88 (4th Cir. 1994); see also O'Dell v. Netherland, 95 F.3d 1214, 1241 (4th Cir. 1996) (en banc) (holding that unambiguous procedural rules derived from state statutes or court rules are necessarily "firmly established").

Bacon concedes that § 15A-1419(a)(1) "generally" provides a basis for a valid procedural default. But he contends that in this case, the application is novel and not firmly established. See McCarver v. Lee, ___ F.3d ___, ___, 2000 WL 719673, at *4 (4th Cir. May 23, 2000) ("The question we must ask . . . is whether the particular procedural bar is applied consistently to cases that are procedurally analogous").

Bacon contends that the state MAR court's order granting reconsideration of his dismissed MAR "resurrected" the MAR and delayed the date of final judgment. State v. Basden, 515 S.E. 2d 220, 222 (N.C. 1999) (holding that a court's decision to reconsider an earlier order dismissing a MAR caused the MAR "to be pending before [that] court until it was again denied"). He thus argues that his February 15, 1996 amended MAR, while arguably a second or successive MAR under § 15A-1419(a)(1), revived the original MAR with amendments when the court granted his motion for reconsideration.

The State argues that the state MAR court was deprived of its authority to reopen the original MAR because the motion for reconsideration was untimely. It argues that the common-law rule that a judgment cannot be altered after the end of the term of court in which it issued applied in this case. See State v. Godwin, 187 S.E. 560, 561 (N.C. 1936) ("Until the expiration of the term the orders and judgments of the court are in fieri, and the judge has power, in his discretion, to make such changes and modifications in them as he may deem wise and appropriate for the administration of justice"). But there is some basis for doubting whether this common-law rule applies in the MAR context. See N.C. Gen. Stat. § 7A-47.1; In re Burton, 126 S.E.2d 581, 585 (1962). Moreover, Bacon has pointed to a number of reported and unreported cases in which a MAR court has granted reconsideration after the term of court had expired.

Because the state MAR court reopened the original MAR, the question of whether a governing state rule was regularly and consis-

9

tently applied to treat a motion to amend thereafter as a second MAR is in some doubt. While it is not our role to resolve the issue or to review the correctness of the state MAR court's application of its state-law procedural rules, we must nevertheless assure ourselves that the rule applied is a "firmly established and regularly followed state practice." Ford v. Georgia, 498 U.S. 411, 423-24 (1991). In this case, that assurance is elusive. Because we ultimately conclude that the assertedly defaulted claims are without merit, we will exercise our prerogative to decide Bacon's claims on the merits rather than on grounds of procedural default. See Royal v. Taylor, 188 F.3d 239, 247 (4th Cir. 1999).

III

The State contends, on the merits of Bacon's (f)(8) claim, that the state MAR court's ruling rejecting this claim was not "contrary to" or "an unreasonable application of" the federal law governing the effective assistance of counsel. It argues that the district court erred in concluding otherwise.

The district court found that Bacon's counsel at the 1991 resentencing hearing had failed to put forth available evidence that would support the mitigating circumstance that Bacon aided in the apprehension of another capital felon, as recognized by N.C. Gen. Stat. § 15A-2000(f)(8).**2** The court found this failure "startling considering the virtual roadmap laid out by the North Carolina Supreme Court." The district court concluded that this failure was constitutionally deficient and also that there was a reasonable probability that, but for the failure to present the evidence, a life sentence might have resulted. Accordingly, the district court ruled that Bacon had "not receive[d]

_____

**2** Section 15A-2000 provides in pertinent part:

> (f) Mitigating Circumstances. -- Mitigating circumstances which may be considered shall include, but not be limited to, the following:
>
> * * *
>
> (8) The defendant aided in the apprehension of another capital felon or testified truthfully on behalf of the prosecution in another prosecution of a felony.

10

effective assistance of counsel as guaranteed him by the Sixth Amendment" and that the state MAR court's decision rejecting Bacon's (f)(8) effectiveness claim was thus "contrary to or involved an unreasonable application of the clearly established Federal law as determined by the Supreme Court in Strickland v. Washington, 466 U.S. 668 (1984)."

In addressing the merits of Bacon's claim that he was deprived of the effective assistance of counsel by their failure to present evidence supporting the (f)(8) mitigating circumstance, we apply the standard of review established by the Antiterrorism and Effective Death Penalty Act of 1996. Because the state MAR court dismissed Bacon's claim on the merits (as well as on the basis of the state procedural bar), we confine our review to whether the court's determination "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C.§ 2254(d)(1). Where, as here, a state court summarily rejects a claim without articulating reasons, its order nevertheless constitutes an "adjudicat[ion] on the merits" for purposes of § 2254(d). See Cardwell v. Greene, 152 F.3d 331, 339 (4th Cir. 1998); Wright v. Angelone, 151 F.3d 151, 156-57 (4th Cir. 1998). But because we have "no indication of how the state court applied federal law to the facts," we must "necessarily perform [our] own review of the record." Cardwell, 152 F.3d at 339; see also Green v. Catoe, No. 99-30, slip op. at 4, 220 F.3d 220, ___ (4th Cir. Aug. 1, 2000). To prevail on his ineffective-assistance-of-counsel claim, Bacon must meet two well established requirements. First, he "must show that counsel's representation fell below an objective standard of reasonableness." Strickland v. Washington, 466 U.S. 668, 688 (1984). This is a difficult showing to make because in assessing the reasonableness of counsel's course of action, "[o]ur review . . . is highly deferential" to counsel. Wilson v. Greene, 155 F.3d 396, 403 (4th Cir. 1998) (citing Strickland, 466 U.S. at 689). Second, he must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.

Bacon contends that the North Carolina Supreme Court gave his attorneys a "virtual roadmap" of the evidence that would support an

11

(f)(8) mitigating-circumstance instruction, when the court in <u>Bacon I</u> stated:

> The record reveals that on the night of the murder Bonnie Sue Clark told the police that mysterious assailants had opened her car door and slammed her head against the steering wheel thus rendering her unconscious. She was unable to provide further information as to her assailants. After being examined at the hospital, she reiterated her exculpatory statements and reduced them to writing at the police station. <u>See State v. Clark</u>, 324 N.C. 146, 377 S.E.2d 54 (1989). At approximately the same time, [Bacon] told police officers that: he had been in the automobile with Bonnie Sue Clark and the victim, Glennie Leroy Clark; the victim called him a "nigger" and pulled a knife on him; he grabbed the knife from the victim and stabbed him; and, all of this took place while Bonnie Sue Clark was in the vehicle. It was at this point that the investigators first began to focus on Bonnie Sue Clark as a possible accomplice in the murder. Obviously if [Bacon's] version of the events was proven true, then Bonnie Sue Clark was lying. [Bacon's] story did not turn out to be totally accurate with respect to motive, intent, etc. However the fact that defendant, not mysterious assailants, did the killing was sufficient to arouse the suspicions of the investigating police officers as to Bonnie Sue's role in this killing. <u>This is sufficient to submit the mitigating circumstance of aiding "in the apprehension of another capital felon" to the jury. It was error not to do so</u>.

<u>Bacon I</u>, 390 S.E.2d at 335 (emphasis added).

The court's decision in <u>Bacon I</u>, however, clearly did not deal with attorney error but with the trial court's instructional error. The conduct of Bacon's attorneys at the resentencing hearing, accordingly, must be judged not in light of the circumstances reviewed by the North Carolina Supreme Court in <u>Bacon I</u>, but on the particular circumstances of the resentencing hearing. As the Supreme Court has emphasized, "no particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel. Rather, courts must judge the reasonableness of

12

counsel's conduct on the facts of the particular case, viewed as of the time of counsel's conduct, and judicial scrutiny of counsel's performance must be highly deferential." Roe v. Flores-Ortega, 120 S. Ct. 1029, 1034-35 (2000) (internal citations and quotation marks omitted).

The evidence that the North Carolina Supreme Court viewed as supporting the (f)(8) instruction had been introduced in the first sentencing hearing by the prosecution through the testimony of the police officers who investigated the murder. At resentencing, however, the prosecution took a different tack, choosing not to call the officers as witnesses. This altered the strategic landscape, and Bacon's attorneys could have considered that the officers, if called to the stand, would provide testimony that was more damaging to Bacon's cause than helpful.

Weighing the danger of damaging testimony by the police officers, Bacon's attorneys also had to consider that the evidence supporting the (f)(8) mitigating circumstance might provide only a slight benefit. While the North Carolina Supreme Court held that the form of "aid" that Bacon provided would support a jury instruction, it was by no means an unequivocal demonstration of a purposive effort by Bacon to assist in the police investigation. Bacon at first insisted that Bonnie Sue was "not involved." It was only after Bonnie Sue had received Miranda warnings and Bacon had been confronted with additional evidence that Bacon admitted that he and Bonnie Sue had "planned to get rid of" Glennie Clark. The aid Bacon gave before police suspicion was trained on Bonnie Sue came from the fact that he confessed to his own involvement and gave an account of the murder that was inconsistent with the cover story upon which he and Bonnie Sue had agreed. Bacon's attorneys could reasonably have concluded that the jury would give little weight to this inadvertent form of assistance in apprehending Bonnie Sue.

In view of the tactical considerations confronted by counsel, we cannot conclude that their failure to present evidence of the (f)(8) mitigating circumstance at Bacon's resentencing hearing fell "outside the wide range of professionally competent assistance." Strickland, 466 U.S. at 690. Accordingly, the state MAR court's denial of this claim was not contrary to, or an unreasonable application of Strickland, see

13

28 U.S.C. § 2254(d)(1), and the district court's order denying summary judgment on this claim and granting Bacon the writ of habeas corpus must be reversed.

IV

On his cross-appeal, Bacon contends first that the district court erred in rejecting claims that his counsel were ineffective (1) by failing to fully investigate mitigating evidence and present it to the 1991 sentencing jury; (2) by presenting videotaped testimony that referred to his possible parole if sentenced to life imprisonment; (3) by informing the jury that he had been sentenced to death at the first sentencing hearing; and (4) by reading into the record excerpts of the transcript of Bacon's testimony from the first sentencing hearing.

The state MAR court rejected some of these claims because they were procedurally defaulted and rejected all of them on the merits. The district court denied all of these claims on the merits. Because these claims were either not procedurally defaulted or the procedural default was questionable for the reasons given in Part II, supra, we address each claim on the merits.

A

Bacon's first ineffective-assistance-of-counsel claim is based on his contention that his counsel should have conducted a more thorough investigation into his background. According to Bacon, "[h]ad counsel conducted a proper investigation of [his] case, testimony could have been presented from a large number of family members, teachers, and friends. These witnesses could have personally and poignantly described events that shaped [his] character and helped to explain why Bonnie Clark was able to manipulate Robert into killing her husband." Similarly, Bacon asserts that diligent investigation by his attorneys would have produced evidence of his positive adaptation to incarceration.

The district court determined that Bacon's claim of ineffective assistance of counsel was meritless and that the state MAR court's summary rejection of the claim on the merits was therefore not an

14

unreasonable application of "Strickland and its progeny" to the facts of this case.

After the North Carolina Supreme Court vacated Bacon's first death sentence and ordered a new sentencing hearing, his attorneys did not conduct an additional investigation into Bacon's background or his prison record[3] but relied instead on the information they had gathered in preparation for the first sentencing hearing. In 1987, two months prior to Bacon's capital trial, his counsel, together with a member of the prosecution team, traveled to Ayer, Massachusetts, where Bacon grew up and lived most of his life, and spent a weekend there interviewing Bacon's friends and former neighbors. Sixteen of these interviews were videotaped, and portions of the videotaped interviews were presented at both the 1987 sentencing hearing and the 1991 resentencing hearing. At the resentencing hearing, the jury also heard from Dr. Billy Royal, a defense psychiatrist, who related information about Bacon's background, which he had gleaned from discussions with Bacon and his sister, from prison records, from testimony given at Bacon's trial and first sentencing hearing, and from psychological tests taken by Bacon.

The North Carolina Supreme Court summarized as follows the testimony thus presented by Bacon's counsel at the resentencing hearing:

> [Bacon] presented further testimony at the resentencing proceeding from numerous friends and family members that he was an affable, pleasant person; a good student who never gave any trouble; giving and a leader; always there to help; not one to hurt anybody; popular in school and involved in sports-related activities; a clean-cut kid and a fine young man; a very trustworthy young man who had the ability to excel in anything that he wanted to start as far as

_____

[3] At the first sentencing, the jury considered evidence of Bacon's adaptability to prison life and did not unanimously find that it had been proven to be a mitigating factor by a preponderance of the evidence. Counsel should not be second-guessed for deciding not to raise this subject before the resentencing jury.

15

life at school or business; and an upright citizen with unquestionable character.

> Dr. Billy Royal, a psychiatrist, described [Bacon] as "pleasant," of "average intelligence," and relatively unemotional, with "a very limited view of himself and not a very good self image in terms of being very successful in life." Dr. Royal opined that the murder resulted from the meshing of the psychological needs of [Bacon] and co-conspirator Bonnie Sue Clark. [Bacon] "had a history . . . of becoming involved [with] people that were in need of assistance" and tried "to help rescue Ms. Clark from her reported abuse by her husband." It was the racial slurs, however, directed at [Bacon] by Sergeant [Glennie] Clark in the car that "resulted in his [losing] control." The murder was thus an "impulsive act," and even though [Bacon] stabbed Sergeant Clark some sixteen times, [Bacon] was "a very angry frustrated person at the time." Dr. Royal concluded that [Bacon's] capacity "to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law" at the time of the killing was impaired and the murder was committed while [Bacon] was "under the influence of [a] mental or emotional disturbance."

Bacon II, 446 S.E.2d at 549.

Bacon asserts that a more diligent investigation of his background would have produced evidence showing that he did not have a positive relationship with his father; that his father was an inveterate adulterer; that Bacon's mother enlisted him in her efforts to uncover his father's infidelity; that as a result of tensions in the home, Bacon developed a serious bedwetting problem that persisted until he was 14 or 15 years old; that he was well-liked by his teachers and classmates; and that he stopped fights and protected others at school. Bacon contends that "[t]he relevance and mitigating value of this evidence in a case where [Bacon] was recruited by an abused woman to kill her alcoholic abuser is patent."

In evaluating a claim that a defendant received ineffective assistance of counsel because counsel conducted an inadequate investiga-

16

tion, the "decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." Strickland, 466 U.S. at 691. Thus, we review counsel's judgments not for what is "prudent or appropriate, but only what is constitutionally compelled." United States v. Cronic, 466 U.S. 648, 665 n.38 (1984). And a decision not to investigate further is "reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." Strickland, 466 U.S. at 691.

In this case, Bacon's counsel could reasonably have concluded, based on their earlier investigation, that the evidence they had developed and would be presenting would give the jury an accurate picture of Bacon's personality and that further investigation into Bacon's background would not be fruitful. Such a determination could be based on their view that any further evidence would be cumulative or that the unhappy circumstances of Bacon's childhood would not have substantial mitigating value in the eyes of the jury. See Royal v. Taylor, 188 F.3d 239, 249 (4th Cir. 1999) ("[R]eliance on evidence of psychological impairments or personal history as mitigating factors in sentencing can be a `double-edged sword'" (quoting Wright v. Angelone, 151 F.3d 151, 162 (4th Cir. 1998))); Plath v. Moore, 130 F.3d 595, 601-02 (4th Cir. 1997) (failure to "make an exhaustive examination of [the defendant's] background and mental state" was not unreasonable in light of other mitigating evidence presented); Turner v. Williams, 35 F.3d 872, 902 (4th Cir. 1994) ("[Counsel] thought it might offend some members of the rural Virginia jury if they emphasized [the defendant's] deprived upbringing or suggested that one might commit murder as a result of it"), overruled on other grounds by O'Dell v. Netherland, 95 F.3d 1214, 1222 (4th Cir. 1996) (en banc); see also Card v. Dugger, 911 F.2d 1494, 1511 (11th Cir. 1990) ("[E]mphasizing a client's deprived childhood does not have a very beneficial impact on a northwest Florida jury, given the fact that many jurors have had difficult lives, but have not turned to criminal conduct"); Parks v. Brown, 840 F.2d 1496, 1509-10 (10th Cir. 1987) (holding counsel's decision not to call a succession of character witnesses at a capital sentencing hearing a reasonable tactical decision, and noting that the exposure of defendant's life history might well have prejudiced him further in the eyes of the jury), rev'd on other

17

grounds, 860 F.2d 1545, 1548 (1988) (en banc), rev'd sub nom. Saffle v. Parks, 494 U.S. 484 (1990).

Notwithstanding these considerations supporting counsel's decision not to develop further mitigating evidence, Bacon argues that the Supreme Court's recent decision in Williams (Terry) v. Taylor, 120 S. Ct. 1495 (2000), requires that Bacon be given an evidentiary hearing on this issue. In Williams (Terry), the defendant's counsel began preparations for the sentencing phase of the proceedings only a week before trial and "failed to conduct an investigation that would have uncovered extensive records graphically describing Williams' nightmarish childhood" that was "filled with abuse and privation." Id. at 1514, 1515. His counsel also "failed to introduce available evidence that Williams was `borderline mentally retarded.'" Id. at 1514. The jury in Williams' case also did not learn that his "parents had been imprisoned for the criminal neglect of Williams and his siblings," id., or that he had received "prison commendations . .. for his help in breaking up a prison drug ring and for returning a guard's wallet," id. at 1502 n.4. The only evidence that Williams' counsel did offer in mitigation was that Williams had "turned himself in . . . expressing remorse for his actions, and cooperating with the police after that." Id. at 1515.

It hardly bears noting that the omitted evidence in Williams (Terry), unlike the evidence omitted in this case, was not cumulative of the evidence that had been presented, and would have been more likely to "influence[ ] the jury's appraisal of [the defendant's] moral culpability." Williams (Terry), 120 S. Ct. at 1515. While the Court held that trial strategy could not be a justification for the failure of Williams' counsel to develop and present the available mitigating evidence, we cannot say the same with respect to the strategy of Bacon's counsel. We therefore conclude that the state MAR court's denial of this claim on the merits was not an unreasonable application of Strickland.

B

Bacon also contends that the performance of his counsel at the resentencing hearing was constitutionally deficient because they presented videotaped depositions of Bacon's friends and former neigh-

18

bors that contained explicit or implicit references to his possible parole if sentenced to life imprisonment. Because Bacon made this argument on direct appeal to the North Carolina Supreme Court, which rejected it, see Bacon II, 446 S.E.2d at 554-55, our review is limited to determining whether the North Carolina Supreme Court's rejection of this claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1); see also Williams (Terry), 120 S. Ct. at 1523.

The videotaped depositions of Bacon's friends and former neighbors generally provided testimony of Bacon's peaceful nature and good character. Bacon's counsel asked one witness,"You think if Robert was given life in prison and served whatever number of years he served and was released, he would be welcomed back in this community?" The witness responded, "I would welcome him. I think his friends would welcome him." A second witness was asked, "If the jury does sentence Robert to life in prison and he serves a number of years, and he's released or paroled, would you welcome him back in the community, knowing that he's been convicted of first-degree murder?" This witness also responded in the affirmative. Two other witnesses were asked, without explicit reference to the possibility that Bacon could be paroled, whether they would welcome Bacon into their homes. Both witnesses stated that they would.

Disposing of Bacon's claim, the North Carolina Supreme Court found that

> the thrust of the questions posed to these witnesses dwelt upon [Bacon's] purported good character and how out of character the killing was. The references to parole all occurred in the context of [Bacon's] former friends and their unchanged favorable view of him following his conviction. We do not believe defense counsel acted unreasonably in eliciting this favorable testimony.

Bacon II, 446 S.E.2d at 554. The court thus found that the performance of Bacon's counsel in presenting this testimony did not fall below an objective standard of reasonableness. We cannot conclude that this determination was contrary to, or involved an unreasonable

19

application of, the first prong of the Strickland test. See 466 U.S. at 688.

C

Bacon contends that his counsel's performance was similarly deficient because they informed the jury that Bacon had previously been sentenced to death by another jury. Again, because this argument was presented to and rejected by the North Carolina Supreme Court, see Bacon II, 446 S.E.2d at 555, we determine only whether that court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1).

While cross-examining defense psychiatrist Dr. Billy Royal, the state prosecutor elicited testimony regarding the presence at Bacon's first trial of several members of Bacon's family, who were absent from the resentencing proceeding. During closing arguments, Bacon's counsel sought to explain this absence, saying:

> But it doesn't mean they don't care. Robert's mother testified in the original trial. She was here. And Robert's mother had to sit here in the courtroom and listen to a judge impose a death penalty on her son. And so I suggest that it shouldn't surprise you that she's not here again.

Bacon contends that this mention of his previous sentence was prejudicial and tainted the jury's decision. He argues that the jury was much more likely to impose a sentence of death knowing that a previous jury had recommended death.

Disposing of this claim on direct appeal, the North Carolina Supreme Court stated:

> We deem [defense counsel's closing] argument a trial tactic to explain the absence of [Bacon's] mother. See State v. Richards, 294 N.C. 474, 500, 242 S.E.2d 844, 860 (1978). In addition, mere knowledge by the jurors of the prior death sentence does not necessarily demonstrate prejudice to the

20

defendant. See State v. Simpson, 331 N.C. 267, 271, 415 S.E.2d 351, 353-54 (1992). We conclude that defendant has failed to show that his counsel performed below an objective standard of reasonableness or that actual prejudice resulted.

Bacon II, 446 S.E.2d at 555. The district court found that the North Carolina Supreme Court's application of the Strickland test was not unreasonable, even though the district court expressed concerns about "the competence of any attorney who would mention the prior death penalty of his client in any context." We agree with the district court's conclusion.

Counsel submitted to the jury the mitigating circumstance "[t]hat the defendant's family loved him, has continued to visit him while he [was] incarcerated, and will continue to do so if he is sentenced to life imprisonment." Counsel might have concluded that the absence of Bacon's mother from the courtroom would severely undermine this contention. By alluding to the emotional anguish a mother would feel upon seeing her son sentenced to death, counsel provided an explanation for the absence of Bacon's mother and appealed to the jury's sympathies. And indeed, the jury ultimately found this mitigating circumstance to exist and to have mitigating value. **4**

The "highly deferential" form of review prescribed by Strickland requires us to "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689. Accordingly, we conclude that the North Carolina Supreme Court's determination that Bacon's counsel did not

_____

**4** The statement by Bacon's counsel really did not tell the jury anything that was not already obvious to them. The jurors had been told during the course of the proceedings that four years earlier there had been a trial and that during it Bacon had been found guilty of murder. The jury also knew that Bacon had given testimony at a previous penalty phase hearing. Thus, the jurors would have known that the current proceeding was a second sentencing hearing and one that would have been unnecessary if the first sentence had been the life sentence Bacon was seeking. Given these facts, we substantially discount any harm to have been caused by defense counsel's argument mentioning the previous sentencing.

21

provide constitutionally deficient assistance when he informed the jury of the prior death sentence was not contrary to or an unreasonable application of Strickland.

D

Finally, Bacon claims that he was rendered ineffective assistance of counsel because his attorney read into the record at the resentencing hearing damaging portions of Bacon's testimony from the first sentencing hearing, which he contends amounted to "helping the State present its case for death." The state MAR court summarily denied the claim, stating only that "[t]he affidavits and the record do not support the claim that the defendant's counsel were deficient . . . or that he was prejudiced thereby." The district court also concluded on the merits that "counsel's decision to read the entirety of his client's trial testimony into the record was the type of tactical decision to which Strickland requires deference."

Although Bacon testified at the first sentencing hearing in 1987, he elected not to do so at the 1991 resentencing hearing. Nonetheless, much of Bacon's 1987 testimony was read into the record. In presenting this testimony, Bacon's counsel read aloud the questions he had asked Bacon on direct examination in the first sentencing hearing, as well as Bacon's responses, and the prosecutor read aloud the questions asked on cross-examination and Bacon's answers. According to Bacon, this testimony was "extremely damaging," particularly Bacon's statements that he was not in love with Bonnie Sue Clark and "would have never been in love with her," which tended to undermine Bacon's efforts to rebut the State's theory that the murder was committed for pecuniary gain. Bacon now contends that, by participating in the presentation of this evidence, his counsel abandoned his role as an advocate and "acted as an adjunct to the prosecution."

We cannot agree with Bacon's characterization. As the district court recognized, Bacon's prior testimony would have been admissible at the resentencing hearing in any event as admissions of a party-opponent. See N.C. R. Evid. 801(d)(A). Bacon's counsel could reasonably have determined that by reading the testimony himself, he could "remove the sting" better than if it were read entirely by the prosecutor. Ohler v. United States, 120 S. Ct. 1851, 1854 (2000) (dis-

22

cussing defense strategy of preemptively introducing impeachment evidence). We agree with the district court that this decision was "hardly an unreasonable tactic" and that the state MAR court's dismissal of this claim on the merits was therefore a reasonable application of Strickland.

V

In addition to his ineffective-assistance-of-counsel claims, Bacon contends that his sentencing hearing was infected by racial bias, depriving him of a fair trial and due process of law. In support of this contention, Bacon relies on an affidavit submitted by his attorney, who interviewed six jurors from Bacon's 1991 sentencing hearing and an alternate juror from Bacon's 1987 trial. Two jurors told Bacon's attorney that during sentencing deliberations reference was made to Bacon's race and to his involvement in an interracial relationship with Bonnie Sue Clark. Bacon is an African American, and Bonnie Sue Clark and Glennie Clark are white. The alternate juror told Bacon's attorney that she recalled jurors making racial jokes during the course of the trial.

The state MAR court considered and rejected this claim of error without an evidentiary hearing, concluding that the evidence forecast in the affidavit concerning alleged statements and jokes made by jurors in deliberations would be inadmissible under N.C. Gen. Stat. § 15A-1240. The district court also rejected this claim in Bacon's petition for habeas relief, finding that the "allegations in counsel's affidavit are not sufficient to warrant an evidentiary hearing or granting of the writ." The Federal Rules of Evidence, like the North Carolina statute, prohibit impeachment of a jury verdict by reference to conversations taking place during jury deliberations. See Fed. R. Evid. 606(b); see also Tanner v. United States , 483 U.S. 107, 121 (1987); Gosier v. Welborn, 175 F.3d 504, 510-11 (7th Cir. 1999) (applying Fed. R. Evid. 606(b) to capital habeas proceedings).

Even if evidence of juror deliberations were admissible, we believe that the statements allegedly made would not indicate a "substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)). The jury could appropri-

23

ately have discussed Bacon's race and that of his victim and accomplice because evidence at trial suggested that Bacon had killed Glennie Clark after he used a racial epithet during a heated discussion about Bacon's relationship with Bonnie Sue Clark. Accordingly, the district court did not err in denying Bacon's claim for habeas relief on this ground.

VI

Finally, Bacon contends that his rights under the Eighth and Fourteenth Amendments were violated because the trial court refused to instruct the jury that if Bacon were sentenced to life imprisonment, he would not be eligible for parole for 20 years. To rebut the State's arguments concerning Bacon's future dangerousness, Bacon's counsel presented the testimony of several witnesses who testified that Bacon would be welcomed back into the community if he received a life sentence and was later released. Bacon then requested a clarifying instruction on parole eligibility, which the trial court refused to give.

On direct appeal, Bacon challenged the trial court's ruling on federal constitutional grounds, relying on Simmons v. South Carolina, 512 U.S. 154 (1994). The North Carolina Supreme Court rejected the challenge, distinguishing Simmons on the ground that Bacon would not have been ineligible for parole. See Bacon II, 446 S.E.2d at 558-59. The district court denied the claim for the same reason, concluding that the North Carolina Supreme Court had correctly held that Simmons was not controlling in this case. We agree. "Simmons applies only to instances where, as a legal matter, there is no possibility of parole if the jury decides the appropriate sentence is life in prison." Ramdass v. Angelone, 120 S. Ct. 2113, 2121 (2000); see also id. at 2127 (O'Connor, J., concurring). Moreover, we have consistently refused to extend Simmons to situations where the defendant would be eligible for parole. See, e.g. , Roach v. Angelone, 176 F.3d 210, 220 (4th Cir. 1999); Keel v. French, 162 F.3d 263, 270 (4th Cir. 1998); Fitzgerald v. Greene, 150 F.3d 357, 367 (4th Cir. 1998). Because Bacon would not have been ineligible for parole under North Carolina law, he was not entitled to a Simmons instruction on parole eligibility, and the district court properly denied his petition for habeas relief on this claim.

24

VII

For the foregoing reasons, we reverse the district court's grant of the writ of habeas corpus based on ineffective assistance of counsel and affirm its rulings rejecting Bacon's other claims for habeas corpus relief.

AFFIRMED IN PART, REVERSED IN PART

KING, Circuit Judge, dissenting in part:

It has been said that "The right to be heard does not . . . include the right to be taken seriously."[1] In a very real sense, the opposite is true in death penalty cases. A defendant must not only be allowed opportunities to be heard -- on direct appeal, in a motion for appropriate relief, and in a federal habeas corpus petition, but claims made in the course of those proceedings must be given the serious consideration they are due.

In this case, there is no doubt that Robert Bacon has been afforded proceedings in which to allege errors in his trial and sentencing; on this record, however, I am not convinced that each of his claims have been given the serious consideration they are due. Specifically, Bacon alleged that: (1) his resentencing counsel disclosed to the jury that Bacon previously had received a death sentence; (2) his resentencing counsel failed to properly investigate and introduce mitigating evidence relating to his childhood and background; and (3) his resentencing counsel failed to investigate and introduce mitigating evidence of his adaptability to prison. Bacon has never received an evidentiary hearing on any of these properly preserved claims, and he would be entitled to relief if the factual allegations supporting these claims prove to be true. Given these circumstances and the fact that North Carolina has not, in my view, treated these three claims in a manner that indicates they were taken seriously, I must dissent.[2]

_____

[1] The Harper Book of Quotations, at 255 (Robert I. Fitzhenry ed., 3d ed. 1993) (Hubert Humphrey).
[2] I concur in the judgment with respect to the majority's disposition of Bacon's other claims and the State's appeal.

I.

Before discussing Bacon's request for a hearing, I must address the majority's suggestion that these claims were procedurally defaulted -- a suggestion relied upon in large part by the North Carolina courts to deny Bacon's claims.

The state courts of North Carolina concluded that Bacon procedurally defaulted on the three aforementioned Sixth Amendment claims. Although the majority has suggested this to be the correct conclusion, it also has exercised its discretion to address-- and dispose of -- Bacon's claims on the merits. For the reasons set forth below, I cannot agree that Bacon procedurally defaulted these claims in state court.

A.

Bacon timely filed his Motion for Appropriate Relief ("MAR") on September 25, 1995. Along with his MAR, Bacon filed a pleading captioned "Notice of Intention to Amend Motion for Appropriate Relief" ("Notice MAR"), which (1) outlined numerous other claims and (2) explained that cutbacks in funding for a capital resource center, coupled with the denial of his motion for extension of time, precluded him from filing each exception at that time. On November 20, 1995, the state MAR court denied Bacon's MAR without a hearing and took no action on the Notice MAR.

On February 15, 1996, Bacon filed his "Amended MAR." In response, the State argued that the state MAR court had no authority to consider this Amended MAR, inasmuch as the court had already dismissed the MAR. On February 28, 1996, the state MAR court disagreed, stating:

> It is the ruling of this Court that the Court will grant the defendant's amended Motion for Appropriate Relief. That I will reconsider the order denying an evidentiary hearing and dismissing the Motion for Appropriate Relief and I will set a date for further arguments on the question of whether or not the Court will grant an evidentiary hearing or whether

26

> the Court will deny the defendant's motion and amended
> Motion for Appropriate Relief on the pleadings.

J.A. 473 (emphasis added).

The state MAR court subsequently heard argument on May 6, 1996. During this proceeding, the State argued that the state MAR court did not have the power to reconsider its ruling because the "Amended MAR" was actually a "Second MAR," which was prohibited under the state rules. See ante at 12. By an order dated May 10, 1996, the state MAR court agreed with the State and denied the Amended MAR, holding, "The Court does not have the authority to amend, modify, or vacate the order entered denying the defendant's [MAR]."**3** J.A. 480. Based on its holding that it had no authority to reconsider its denial of Bacon's MAR, the state MAR court denied Bacon an evidentiary hearing on each of the claims in his Amended MAR.

B.

We generally do not review a state's dismissal of a claim based on procedural default; however, the basis for declaring a procedural default must be an independent and adequate state ground. See Wainwright v. Sykes, 433 U.S. 72, 81 (1977); see also Thomas v. Davis, 192 F.3d 445, 450 (4th Cir. 1999). In order for the ground to be independent, the state court must have based its decision on a state procedural bar. See Harris v. Reed, 489 U.S. 255, 262 (1989). In turn, the procedural bar is "adequate" only if it is a"firmly established and regularly followed state practice." James v. Kentucky, 466 U.S. 341, 348-49 (1984). Thus, in reviewing this state MAR court's finding of procedural default, we must determine whether the procedural default rule -- that a North Carolina state MAR court does not possess the power to reconsider its dismissal of an MAR -- was"firmly established and regularly followed" such that it is an independent state basis "adequate" to bar federal habeas corpus review. While a rule of procedural default must have been consistently or regularly applied by state courts, there need not have been "undeviating adherence to

_____

**3** The state MAR court also summarily dismissed most of the claims on the merits.

27

such rule admitting of no exception." <u>Meadows v. Legursky</u>, 904 F.2d 903, 907 (4th Cir. 1990) (en banc).

Here, the state MAR court concluded that it lacked the authority to reconsider its denial of Bacon's initial MAR. However, in at least two recent decisions, the Supreme Court of North Carolina has not only permitted, but actually endorsed a state MAR court's authority to reconsider the denial of an MAR. For example, in <u>State v. Basden</u>, 515 S.E.2d 220 (N.C. 1999), the defendant filed an MAR, and the state MAR court denied him relief and dismissed the MAR. Thereafter, the defendant filed a motion to vacate the order denying his MAR; the State moved for summary denial of this motion to vacate; and the state MAR court granted the defendant time to respond. <u>Id.</u> at 221. In characterizing the procedural circumstance present in <u>Basden</u>, the Supreme Court of North Carolina utilized language that is equally apposite here:**4**

> On these facts, we conclude that defendant's motion to vacate the order denying his motion for appropriate relief was essentially a motion to reconsider the denial of his motion for appropriate relief. <u>By allowing defendant time to respond to the State's motion for summary denial of defendant's motion to vacate, the trial court resurrected defendant's motion for appropriate relief. The trial court's actions amounted to a reconsideration of its order dismissing defendant's motion for appropriate relief, thereby causing that motion for appropriate relief to be pending before the trial court until it was again denied</u>.

<u>Id.</u> at 222 (emphasis added). Plainly, by endorsing the "resurrect[ion]" of an MAR, the Supreme Court of North Carolina endorsed a state MAR court's authority to reconsider its denial of an MAR. At the

_____

**4 Basden**, 515 S.E.2d at 222, involved a slightly different question than that presented here. The question in <u>Basden</u> was whether the defendant's MAR was "pending" as of June 21, 1996, when a particular post-conviction discovery statute was enacted. Because the MAR was held to be "pending," the defendant was entitled to discovery of the Government's prosecution file.

28

very least, Basden establishes that the denial of an MAR does not automatically divest a state MAR court of jurisdiction over an MAR.

The Supreme Court of North Carolina also endorsed, in State v. McHone, 499 S.E.2d 761 (N.C. 1998), the power of state MAR courts to reconsider denied MARs. In McHone, the defendant filed an MAR, which the state MAR court summarily denied. Id. at 762. Subsequently, the defendant filed (1) a motion to vacate the denial order and (2) a supplemental MAR. Id. While the Supreme Court of North Carolina was not asked to specifically pass on the ability of the state MAR court to consider a supplemental MAR after the initial MAR had been denied, the Court not only permitted the post-denial supplementation of the MAR, but it also reversed the state MAR court's denial of the supplemented MAR. Id. at 764.

Nevertheless, the State essentially maintains, in an argument apparently adopted by the state MAR court in this case, that a North Carolina MAR court has no jurisdiction to reconsider an MAR once it has been denied. In support of this argument, the State relies upon another recent case, State v. Green, 514 S.E.2d 724 (N.C. 1999). In Green, the defendant filed an MAR, which was denied, and he then moved for reconsideration of the denial. Id. at 726. The MAR court apparently failed to act on his motion, and he had no petition for writ of certiorari pending before the Supreme Court of North Carolina. Id. at 728. Because the state MAR court had not granted the motion to reconsider its denial of Green's MAR and because no MAR was otherwise pending, the defendant was not entitled to invoke discovery provisions that applied to MARs "pending" at the time a state discovery statute was passed. Id.; see also supra note 4.

However, the holding of Green, in which the state MAR court never granted defendant's motion to reconsider, cannot be read -- as the State would have us believe -- as establishing that state MAR courts are without the power to reconsider denied MARs. In my view, Green merely held that if a state MAR court does not grant a motion to reconsider, then the MAR is not "pending." More importantly, even if Green did stand for the rule that the State posits -- that state MAR courts have no authority to reconsider denied MARs-- the State has effectively established, when the holding of Green is compared with

29

that of <u>Basden</u> and <u>McHone</u>, that this procedural default rule is not being applied regularly.

In short, the rule of procedural default applied in this case -- that the state MAR court lacked the authority to reconsider its decision to deny the MAR because it already had been denied-- cannot withstand review. The rule is not independent -- inasmuch as it is not a standing rule in North Carolina, and even if it were independent, it certainly is not adequate -- as illustrated by its uneven application. Indeed, the most recent decisions of the Supreme Court of North Carolina actually endorse a contrary approach. Thus, whatever may be said about the merits of Bacon's claims, it is clear that the state MAR court improperly treated these issues as defaulted. With this background, I next turn to the merits of three of Bacon's Sixth Amendment claims.

II.

To justify federal habeas corpus relief based on allegations of ineffective assistance of counsel, Bacon must establish two elements. First, he must demonstrate that his counsel's performance was deficient. "To establish ineffectiveness, a `defendant must show that counsel's representation fell below an objective standard of reasonableness.'" <u>Williams (Terry) v. Taylor</u>, 120 S. Ct. 1495, 1511 (2000) (quoting <u>Strickland v. Washington</u>, 466 U.S. 668, 688 (1984)). Second, he must demonstrate that the deficient performance prejudiced the defense. "To establish prejudice, he `must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" <u>Williams (Terry)</u>, 120 S. Ct. at 1511-12 (quoting <u>Strickland</u>, 466 U.S. at 694).

A defendant is entitled to a hearing in connection with a federal habeas corpus petition under certain circumstances. At the outset, 28 U.S.C. § 2254(e)(2) prohibits, with certain exceptions, an evidentiary hearing in district court if the applicant "failed to develop the factual basis of a claim." However, "`failed to develop' implies some lack of diligence," <u>Williams (Michael) v. Taylor</u>, 120 S. Ct. 1479, 1487 (2000), and, in this case, Bacon diligently sought-- and was denied -- an evidentiary hearing at each opportunity in state court. Thus, Bacon has not, for purposes of section 2254(e)(2),"failed to develop"

30

the facts underlying his claims, and the section 2254(e)(2) bar does not apply here. Id.; see also Cardwell v. Greene, 152 F.3d 331, 338 (4th Cir. 1998) (holding no bar under section 2254(e)(2) if applicant sought, but was refused, an evidentiary hearing in state court).

However, surmounting the hurdle set by section 2254(e) "does not translate to a conclusion that [Bacon] was entitled to a hearing." Fisher v. Lee, 215 F.3d 438, 455 (4th Cir. 2000). Instead, for an applicant to establish an entitlement to an evidentiary hearing, he must first prove one of the six factors set out by the Supreme Court in Townsend v. Sain, 372 U.S. 293, 313 (1963). See Fisher, 215 F.3d at 454. Those six factors are:

> (1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state-court hearing; or (6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing.

372 U.S. at 313. The North Carolina courts have never afforded Bacon a hearing on these three Sixth Amendment claims. Thus, it is not necessary to dwell on the Townsend factors; several of them plainly are satisfied here.

Second, to establish that a hearing was mandatory, Bacon had to allege "facts that, if true, would entitle him to relief." Fisher, 215 F.3d at 454. This standard is analogous to the measure applied when determining the sufficiency of a complaint. Compare Eastern Shore Markets, Inc. v. J.D. Associates Ltd. Partnership, 213 F.3d 175, 180 (4th Cir. 2000) ("In reviewing a district court's order dismissing a complaint under Federal Rule of Civil Procedure 12(b)(6), . . . we determine, [inter alia,] . . . whether the complaint, under the facts alleged" states a claim for relief.) (quotation marks omitted), with Fisher, 215 F.3d at 454 (in determining whether hearing was mandatory, we must ascertain whether applicant alleges facts "that, if true, would entitle him to relief."). In other words, in assessing whether an evidentiary

31

hearing in the district court was mandatory, we must assess the legal sufficiency of that claim, not the truth of the facts underlying that claim. And, as is the case with motions to dismiss, because only the legal sufficiency of the applicant's claim, and not the facts in support of it, are tested in determining whether a hearing was mandatory, we must assume the truth of all facts alleged. Cf. Eastern Shore, 213 F.3d at 180.

In this context, three of Bacon's claims allege facts that, if true, would establish a meritorious claim. I take these allegations of deficient performance in turn, before turning to the prejudice prong.

A.

1.

The first and primary error that I believe may properly be resolved only after an evidentiary hearing is based on Bacon's lawyer's improper revelation to the resentencing jury that Bacon had been previously been sentenced to death. The following passage from the decision of the Supreme Court of North Carolina in State v. Bacon, 446 S.E.2d 542 (N.C. 1994) ("Bacon II"), describes both the error and resolution, on direct appeal, of Bacon's argument:

> Defendant next contends that his counsel provided ineffective representation by presenting evidence that defendant had received a death sentence in the first sentencing proceeding. During defendant's closing argument, counsel mentioned that defendant comes from a loving family and that during his first sentencing, the courtroom contained several family members, but due to financial considerations and other conflicts revolving around work, the same family members were unable to attend this resentencing. Counsel further argued:
>
> "And [defendant's] mother had to sit here in the courtroom and listen to a judge impose a death penalty on her son. And so I suggest that it shouldn't surprise you that she's not here again."

32

Defendant contends that this mention of his previous sentence was prejudicial and tainted the jury's decision in this case. He argues that the jury was much more likely to impose a sentence of death knowing that a previous jury had recommended death.

We deem this argument a trial tactic to explain the absence of defendant's mother. See State v. Richards, 294 N.C. 474, 500, 242 S.E.2d 844, 860 (1978). In addition, mere knowledge by the jurors of the prior death sentence does not necessarily demonstrate prejudice to the defendant. See State v. Simpson, 331 N.C. 267, 271, 415 S.E.2d 351, 353-54 (1992). We conclude that defendant has failed to show that his counsel performed below an objective standard of reasonableness or that actual prejudice resulted.

Bacon II, 446 S.E.2d at 555 (brackets in original and emphasis added). Subsequently, the ineffective assistance of counsel claim arising out of this error was summarily dismissed by the state MAR court on procedural grounds and apparently also on the merits. J.A. 487.

In reviewing this claim, the district court was clearly concerned with its implications but concluded:

While this court has grave questions about the competence of any attorney who would mention the prior death penalty of his client in any context, especially after having exercised challenges to any jurors who knew of the prior death sentence, the court must apply the AEDPA's standards of review as set out in Green[ v. French, 143 F.3d 865, 870 (4th Cir. 1998) ("habeas relief is authorized only when the state courts have decided the question by interpreting or applying the relevant precedent in a manner that reasonable jurists would all agree is unreasonable.")].

J.A. 53. The court then reviewed the North Carolina courts' resolution of this claim and concluded that "reasonable jurists could agree with the Supreme Court of North Carolina in this application of the Strickland standard of effectiveness of counsel." Id.

33

I disagree with the majority's disposition of this claim for several reasons. First, the Supreme Court of North Carolina's conclusion that this revelation -- that Bacon had previously received a death sentence -- constituted a reasonable "trial tactic" was not based on any evidence; in fact, Bacon was denied the right to an evidentiary hearing on this issue in both the state MAR court and the district court. In that regard, I can conjure no possible legitimate reason why Bacon's own lawyer would believe it necessary to reveal this fact -- that Bacon had received a death sentence during his first sentencing hearing -- to the jury. Certainly, there were several more appropriate ways to explain his mother's absence.

Also, in resolving this claim, the district court may have applied a "reasonableness" inquiry that has been specifically overturned by the Supreme Court. That is, it is unclear whether the district court applied a subjective test to this claim. The court ascertained whether the state court disposed of this claim "in a manner that reasonable jurists would all agree is unreasonable." See Green, 143 F.3d at 870; see also Williams (Terry), 163 F.3d at 865 ("In other words, habeas relief is authorized only when the state courts have decided the question by interpreting or applying the relevant precedent in a manner that reasonable jurists would all agree is unreasonable."). Since the district court issued its ruling, however, the Supreme Court has determined that the "[no] reasonable jurist" language is inapposite under AEDPA. See Williams (Terry), 120 S. Ct. at 1521-22 ("The placement of this additional [`no reasonable jurist'] overlay on the `unreasonable application' clause was erroneous."). Because it is unclear whether the district court applied a subjective or objective legal test, we should remand this appeal for application of the proper legal standard.

In short, Bacon's claim of ineffective assistance of counsel in the improper revelation, to his resentencing jury, of his earlier death sentence has never been tested in an evidentiary hearing; it may have been dismissed under a superceded legal test; and it avers facts that, if true, would demonstrate deficient performance by his lawyer at sentencing.[5] I believe that this claim should be remanded for an evidenti-

_____

[5] The majority hypothesizes that the jury would have known of Bacon's prior death sentence, even if his lawyer had not highlighted it. This

34

ary hearing and reconsideration in light of the objective standards endorsed in Williams (Terry), supra.

2.

Second, Bacon maintains that his resentencing counsel was ineffective in failing to properly investigate and submit evidence about Bacon's family history and character. Bacon avers-- in statements that are supported by (1) an affidavit by Bacon's MAR lawyer, who summarizes her conversations with a psychologist and (2) an affidavit of Bacon's investigator -- that his family history is troubling. Among other things, the affidavits specify numerous facts that allegedly were not submitted during either sentencing proceeding. Taking those allegations to be true, Bacon's father was rarely around when Bacon was young,[6] and when his father finally began to participate in Bacon's family, he proved to be an alcoholic. Bacon's father also engaged in numerous adulterous affairs, and although Bacon was still very young, his mother sought his advice on the family's problems, includ-

_____

hypothesis, for several reasons, rests on shaky footing. First, the majority asserts that the jury would necessarily have realized that "the [ ] proceeding was a second sentencing hearing and one that would have been unnecessary if the first sentence [had not been death]." See ante at 21, n.4. This assumes that Bacon's jury would have made numerous complicated inferences about North Carolina criminal procedure -- inferences that, consistent with the trial court's instructions, would have been improper for it to make in any instance. Second, even if some members of this lay jury had indeed engaged in such an improper endeavor, they may well have drawn alternative conclusions about the procedural history of Bacon's case. Most importantly, however, the majority's hypothesis fails to realize one crucial fact: the potential prejudice of one or more jurors arriving -- through surmise and conjecture -- at an uncertain conclusion regarding Bacon's earlier fate pales in comparison to the actual harm that surely accrued when each juror's attention was pointedly drawn to the prior death sentence.

[6] One affidavit explains that Robert Bacon's father first saw him when he was eight-years old. J.A. 508. Further, the affidavit claims that because Bacon's father was in the military and often assigned abroad, Bacon had very little contact with him until the age of nine.

35

ing his father's adultery and other sensitive subjects.[7] As a result, Bacon showed signs of stress at a young age, including bed-wetting until the age of 14. Bacon also witnessed various incidents in which his father physically abused his mother.[8] Bacon contends that this family history background -- a mother who confessed marital problems to Bacon and sought his help with those problems -- would have been helpful to the jury members in helping them understand how, among other things, Bacon could have been manipulated by Clark -- also a woman who had confessed marital problems to Bacon[9] and sought his help.

Bacon maintains that his counsel at his resentencing hearing conducted no research to supplement the work done in preparation for the first sentencing hearing. Indeed, Bacon alleges that, at his resentencing hearing, his counsel simply used the same character interviews that were submitted in his first sentencing hearing; thus, there was no additional evidence submitted at his second sentencing hearing. In turn, Bacon argues, the preparation for his first sentencing hearing was deeply flawed. Among other things, Bacon asserts that when his lawyer was preparing for his first sentencing hearing, the lawyer only conducted cursory interviews with witnesses who were going to attest to Bacon's good character. In addition, during each of these perfunctory interviews, Bacon's lawyer was accompanied by the State's attorney. That is, during the only trip to Bacon's hometown to interview witnesses, Bacon's lawyer took the prosecutor along, and all of the interviews -- which constituted all of the evidence submitted at each of the sentencing hearings -- were conducted in this fashion. When this unusual manner of interviewing witnesses is coupled with the failure to conduct additional investigation in preparation for the

_____

[7] Among other things, Bacon's mother encouraged him to eavesdrop on his father's phone calls and informed Bacon of her plan to investigate his father's adulterous activities.

[8] For example, on one occasion, when Bacon's mother confronted his father, Bacon's father drove his car down the driveway, dragging Bacon's mother behind.

[9] Bacon was, for example, aware of numerous incidents between Glennie and Bonnie Clark, "including a time when he smashed her head against a cabinet and held a knife to her throat." J.A. 510.

resentencing hearing, Bacon claims that his lawyer's performance fell below the standards provided in Strickland.

The State counters that Bacon's lawyer presented-- at both of Bacon's sentencing hearings -- the testimony of sixteen friends and family members, each of whom testified to his otherwise good character and dependability. See Bacon II, 446 S.E.2d at 549-50 (summarizing evidence submitted); see also ante at 15. Thus, the State contends, the new family history evidence would have been cumulative of the character evidence submitted during the sentencing hearings. Based on this "culmulative" argument, the district court dismissed Bacon's claim, concluding: "A review of the record shows ample evidence admitted at the resentencing hearing concerning petitioner's childhood and background and how his relationship with his allegedly abusive father affected his relationship." J.A. 41.

I cannot agree with the majority or the district court on this issue. There is a substantive difference between the character evidence submitted at both sentencing hearings and the new family history evidence upon which Bacon now relies. The new family history evidence would support the proposition that Bacon's family history uniquely mirrors the circumstances surrounding the crime for which Bacon now faces the death penalty: In both instances (in his family and in his relationship with Clark), a woman was apparently subjected to abuse by her husband; Bacon served as a confidant to the woman, and Bacon was manipulated to take steps he otherwise might not have taken. This evidence is plainly distinguishable from the general character evidence about Bacon's childhood submitted at both sentencing hearings, and in any event, the new family history evidence certainly cannot be characterized as "cumulative" of the general character evidence presented at the resentencing hearing. See ante at 18.

In sum, I believe that the record on this issue is simply too sparse to draw any conclusions on whether Bacon's lawyers were ineffective. Indeed, the district court does not cite to the record in support of its conclusions, and the short, incomplete excerpts from the record, see J.A. 658-90, do not substantiate the district court's conclusions. The new family history evidence upon which Bacon now relies closely parallels Bacon's relationship with Clark, and if we take the allegations in the light most favorable to Bacon-- as we must at this

37

stage -- he has established that his lawyers' performance in the penalty stage of this capital case was deficient on a crucial character issue.

3.

Third, Bacon claims that his counsel erred in failing to submit evidence of Bacon's adaptability to prison. There is no evidence in the record relating to this claim, inasmuch as it has been summarily dismissed without a hearing at both the state MAR level and in the district court. The majority has obviously concluded that the failure to submit evidence relating to this mitigating factor will never, in itself, constitute ineffective assistance of counsel; I, however, cannot. This mitigating circumstance has been endorsed by several courts, see Skipper v. South Carolina, 476 U.S. 1 (1986); Hall v. Washington, 106 F.3d 742, 752 (7th Cir. 1997), and it must be accorded respect as an independent mitigating factor. In that vein, Bacon's petition asserts that considerable evidence of his adaptability to prison existed, including evidence that Bacon had no significant disciplinary infractions while incarcerated from 1987 to February 1991. If these assertions prove to be true, then, depending on the other circumstances, the failure to submit that evidence would constitute ineffective performance in the Strickland sense. While failure to submit this mitigating circumstance might not, standing alone, constitute a basis for a new trial, we should be in a position to review this claim, particularly in the context of the other two Sixth Amendment claims. **10** Again, the record must be developed in order to do so.

_____

**10** The majority undertakes to exonerate Bacon's lawyers by pointing out that (1) the first sentencing jury rejected this mitigating factor, thus (2) counsel's decision not to raise the subject before the resentencing jury was reasonable. See ante at 15, n.3. It is important, however, that the first jury had before it evidence of Bacon's adaptability after only four months in prison. In stark contrast, the resentencing jury had almost five years of Bacon's prison experience to consider. Particularly in light of the existence of additional mitigating factors, Bacon should be permitted to present evidence that this failure on the part of his lawyers constituted or contributed to ineffective assistance on their part.

38

B.

That brings us to the prejudice prong under Strickland. I will not linger on this element because I believe that the Strickland standard is satisfied here. In other words, Bacon has demonstrated a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Williams (Terry), 120 S. Ct. at 1511-12 (quoting Strickland, 466 U.S. at 694).

In terms of aggravating circumstances supporting the imposition of the death penalty, the resentencing jury found only one such circumstance to be present: that "this murder was committed for pecuniary gain." See ante at 6. Moreover, this single aggravating circumstance could be characterized as a "weak" one under North Carolina law: of the fourteen reported decisions issued prior to Bacon's appeal involving only the aggravating circumstance of "pecuniary gain," the jury declined to impose death in twelve of them, and the Supreme Court of North Carolina held the death penalty to be disproportionate in the other two. Bacon II, 446 S.E.2d at 565-66. In other words, at the time of Bacon's resentencing hearing, his was the only reported case in which the death penalty had been imposed based on the single factor of pecuniary gain.

On the other side of the equation, the resentencing jury found myriad mitigating factors to be present in Bacon's case. Among other things, the jury unanimously determined that: (1) Bacon had no significant history of prior criminal activity; (2) Bacon acted under the domination of Clark; (3) Bacon had no history of violent behavior; (4) Bacon's "character, habits, mentality, propensities and activities . . . indicate that he is unlikely to commit another violent crime"; (5) Bacon's criminal conduct was the result of circumstances unlikely to recur; (6) the initial idea for the plan was Clark's; (7) Clark was convicted of the same crime and had received a life sentence; (8) Bacon had shown remorse; and (9) Bacon's "family loved him, has continued to visit him while he has been incarcerated, and will continue to do so if he is sentenced to life imprisonment." J.A. 534-35.

Significantly, moreover, the resentencing jury rejected the mitigating factor that "his educational background, home life, and sobriety had mitigating value." Bacon II, 446 S.E.2d at 549. This fact is impor-

39

tant because if the facts underlying Bacon's claim were true and had been submitted to the jury, it is highly probable that the jury also would have found this mitigating factor in Bacon's favor.

When these nine mitigating factors are compared to the single aggravating circumstance, it becomes clear that the three alleged Sixth Amendment violations -- either collectively or, in the instance of the prior death sentence revelation, individually-- could have affected the outcome of Bacon's resentencing. Indeed, the Supreme Court of North Carolina determined that, in this context, failure to submit the mitigating factor that Bacon aided in the apprehension of his co-conspirator required a new sentencing hearing. Although that decision took place with respect to Bacon's first sentencing hearing, the court's reasoning there is compelling:

> Failing to submit the proper mitigating circumstance created too great a "risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty. When the choice is between life and death, that risk is unacceptable and incompatible with the commands of the Eighth and Fourteenth Amendments." Lockett v. Ohio , 438 U.S. 586, 605 (1978).

> It is impossible for the reviewing court to conclusively determine the extent of the prejudice suffered by defendant; however, defendant has shown that there is a reasonable possibility that had this mitigating circumstance been submitted to the jury, a different result would have been reached at the sentencing hearing. N.C.G.S. § 15A-1443(a) (1988).

> * * *

> For error in the sentencing phase of defendant's trial, the death sentence is vacated and the cause is remanded to Superior Court, Onslow County, for a new sentencing hearing.

State v. Bacon, 390 S.E.2d 327, 336 (N.C. 1990).

40

Thus, in the context of this case -- with one aggravating factor and myriad mitigating factors -- the Supreme Court of North Carolina found the Strickland prejudice factor to be satisfied by the failure to submit to the first sentencing jury one additional mitigating factor: aiding in the apprehension of a co-conspirator. With this background, I am convinced that these three Sixth Amendment claims, collectively or -- in the case of death penalty revelation-- individually, allege facts sufficient to demonstrate prejudice in the Strickland sense. For this reason, I would remand this case for a proper, fair hearing on these issues.

III.

We are delving into the realm of legal fiction when we assert that Bacon received the full measure of fair procedure with respect to these claims of ineffective assistance of counsel. The state MAR court dismissed them on two bases: first invoking a rule of procedural default that is neither firmly established nor regularly followed, then, for good measure, dismissing the claims on the merits with no hearing or explanation. In fact, the state MAR court's opinion addressing Bacon's claims is so terse and perfunctory that it is difficult to determine whether it even addressed the merits of some claims.

We have now compounded the lack of fair procedure by affirming the dismissal of these three claims, again with no evidentiary hearing. Before we permit North Carolina to take Bacon's life, we should be in a position to ascertain the merits of these arguments. In a case such as this -- where a life hangs in the balance -- it is more important than ever that justice not only be done, but that justice also be seen to be done.

I therefore dissent.

41